PUBLISH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 95-9408

_____

D. C. Docket Nos.   CR195-011-03
CR195-011-06
CR195-011-02

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

DAVID W. SUBA, MANAGED RISK SERVICES.,
DENNIS J. KELLY,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Southern District of Georgia

_____

(January 9, 1998)

Before BARKETT, Circuit Judge, HILL, Senior Circuit Judge, and HOWARD*,
Senior District Judge.

_____

*Honorable Alex T. Howard, Jr., Senior U. S. District Judge for the Southern District
of Alabama, sitting by designation.

HILL, Senior Circuit Judge:

Jointly tried and convicted by a jury in a complex Medicare fraud scheme, Appellants Dennis J. Kelly, David W. Suba, and Managed Risk Services, Inc. (Managed Risk) appeal their convictions and sentences on a number of grounds, including insufficiency of the evidence, trial court error in denying Kelly's requested jury charges and motion for a new trial, and sentencing, restitution, and forfeiture errors.[1] We reverse Kelly's conviction only as to Counts 131 and 132 for insufficient evidence and remand his case for re-sentencing in accordance with this opinion. In all other respects, we affirm Kelly's conviction and the convictions and sentences of Suba and Managed Risk.

## I. PROCEDURAL BACKGROUND

Together, Kelly, Suba, and Managed Risk were convicted of one count of conspiracy to defraud the United States and to commit offenses against the United States, in violation of 18 U.S.C. § 371 (Count 1); forty-five counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 36-78, 100-111); and twenty-seven counts of

---

[1] We discuss the sufficiency of the evidence issue at Part V *infra.* All other issues are without merit and affirmed without discussion. *See* 11th Cir. R. 36-1 [Appellants' trial may not have been perfect, but it was fair. *See United States v. Ashworth,* 836 F.2d 260, 268 (6th Cir. 1988) *citing United States v. Hajal,* 555 F.2d 558, 569 (6th Cir. 1977)(where "we have yet to review a perfect jury trial.")].

2

money laundering, in violation of 18 U.S.C. § 1956 (Counts 79-105). Separately, Kelly was convicted of four additional counts of mail fraud (Counts 112-115); six counts of embezzlement from an employee benefit fund, in violation of 18 U.S.C. § 664 (Counts 116-121); eleven additional counts of money laundering (Counts 106-109, 122-123, 125-128, 132); one count of bank fraud, in violation of 18 U.S.C. § 1344 (Count 131); and nineteen counts of making false statements, in violation of 18 U.S.C. § 1001 (Counts 11-26, 30-32).[2] Kelly was sentenced to 151 months' imprisonment followed by three years' supervised release. He was ordered to pay a $75,000 fine, $710,118 in restitution, and to forfeit $934,856.02 under a consent order for criminal forfeiture, 18 U.S.C. § 982 (Count 133). The jury found Suba guilty of all counts charged. He was sentenced to ninety-seven months' imprisonment followed by three years' supervised release. Managed Risk was found guilty of all counts charged. It was placed on five years' probation and ordered to pay a $250,000 fine. Suba and Managed Risk were ordered to pay $710,118 in restitution and to forfeit $390,000 pursuant to the consent order. Both Kelly and Suba are currently incarcerated.

## II. FACTUAL BACKGROUND

A. *Factual Diagram*

---

[2] Kelly was found not guilty on counts 33-35, 124, 129, and 130.

The underlying facts of this case are complex and have been reconstructed from numerous and sometimes tedious paper trails throughout the record. At first, the scheme appears sophisticated. In fact, however, it is really quite simple. Home health care agencies are licensed by Medicare.[3] Medicare is administered by the United States Department of Health and Human Services (HHS). HHS contracts with insurance companies (fiscal intermediaries) to distribute Medicare funds.[4] The fiscal intermediary pays the Medicare funding to providers of medical care, in this case, home health care agencies. Medicare covers the reasonable cost of direct patient care and reasonable and necessary overhead expenses.[5] Appellants allegedly established

---

[3] The Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the Medicare Act), was established in 1965 as a federally funded health care insurance program for the elderly and disabled. The Medicare program is divided into two distinct parts: Medicare Part A (Hospital Insurance for the Aged and Disabled) covers services furnished by hospitals, home health care agencies, hospices, and skilled nursing facilities for inpatient hospital care, inpatient care in a skilled nursing facility following hospital stay, home health care, and hospice care. Medicare Part B (Supplementary Medical Insurance for the Aged and Disabled) covers physician services, outpatient hospital care and a range of other noninstitutional services, such as ambulance services, durable medical equipment, diagnostic laboratory tests and X-rays.

[4] Fiscal intermediaries and carriers are government contractors who administer payments to health care providers. 42 U.S.C. §§ 1395h, 1395u. Fiscal intermediaries handle claims covered under Medicare's Part A program; carriers handle claims covered under Part B. Once treatment is administered, Medicare, through its fiscal intermediaries and carriers, determines the rates and amounts of payments to providers, and reimburses the patient. Id.

[5] Insuring fiscal responsibility, curtailing health care costs, and eliminating the over-utilization of health care services are fundamental aims of the Medicare program. S.Rep.No. 404, 89th Cong., 1st Sess. 1965, *reprinted in* 1965 U.S.C.C.A.N. 1943. The Medicare program reflects a congressional judgment that the federal government should not readily reimburse a health care provider when its services have not been utilized properly. *Monmouth Medical Center v. Harris,* 646 F.2d 74, 76 (3d Cir. 1981). There could be nothing clearer in the plain meaning of the

4

certain overhead expenses, appearing genuine, but in fact, neither reasonable or necessary. These expenses were reimbursed by Medicare. The reimbursed funds allegedly found their way into Appellants' pockets.[6]

The following is a pictorial diagram[7] of the interrelationships of the participants in the sequence of events leading up to the indictment:

---

[Medicare Act] . . . Congress did not intend to have Medicare funds used to subsidize Medicare fraud. *Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 578 (D.C. Cir. 1980).

[6] Understanding how the Appellants committed Medicare fraud, and how that fraud relates to charges of false statements, money laundering, mail fraud and embezzlement from an employee benefit fund is critical in an analysis of the sufficiency of the evidence.

[7] This diagram was prepared by counsel for the United States as Government Exhibit (GX) 1161G and attached to its brief. It should be viewed with that in mind. We believe it is helpful in understanding the factual background of this case.



B. *The Medicare Conspirators Charged*[8]

---

[8] The 133-count indictment was originally returned against six defendants: Jeannette G. Garrison, Healthmaster, Inc. (Healthmaster), and Master Health Plan, Inc. (Master Health), as well as Appellants. Prior to trial, Garrison entered a guilty plea to the conspiracy count and nine counts of making false statements. The submission of false cost reports to Healthmaster's fiscal

1. *Healthmaster, Garrison & Master Health*

Healthmaster, Inc. (Healthmaster) was a large, yet privately owned, home health care company based in Augusta, Georgia.[9] Jeanette G. Garrison was its chief executive officer and sole shareholder.[10] Healthmaster provided in-home nursing care for eligible persons with illnesses and disabilities. Approximately 92% of Healthmaster's revenues were derived from providing in-home nursing care to Medicare eligible patients. The balance was reimbursed by Medicaid and private insurance.

Medicare guidelines provide reimbursement to Healthmaster for costs of direct patient care and reasonable and necessary overhead expenses.[11] Reimbursements

intermediary formed the basis for her guilty plea. In return, she received a prison sentence and charges against Healthmaster and Master Health were dismissed. Garrison testified for the government at trial. The appeal of her sentence is currently pending before this court.

[9] Healthmaster operated in five states with twenty-two divisions in 125 separate locations. It is estimated that 3,000 employees made two million home visits per year. Healthmaster had approximate gross annual revenue of $100 million.

[10] Garrison also was the sole shareholder of Preferred Care Companies (Preferred Care or PCC), a holding company owning Healthmaster Pharmaceutical and Equipment Company, Inc. (Healthmaster Pharmaceutical), a durable medical equipment sales company, and Healthmaster Home Care of Georgia, Inc. (Healthmaster Home Care), a provider of home visitation services, other than skilled nursing). Both Healthmaster Pharmaceutical and Healthmaster Home Care were non-Medicare reimbursed companies.

[11] The Medicare Act provides a controlling standard against which all coverage determinations must be measured under Part A: "Notwithstanding any other provision of this sub-chapter, no payment may be made . . . for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395(a)(1)(A).

claimed by Healthmaster were submitted on cost reports to Aetna Life and Casualty Insurance Company (Aetna), the fiscal intermediary for HHS, who apparently did not discover any improper submissions. The cost reports required Healthmaster to declare whether or not its business transactions, such as purchasing supplies or services, were conducted with companies to whom it was "related."[12] Master Health Plan, Inc. (Master Health), Garrison's health maintenance organization (HMO), as a wholly owned subsidiary of Healthmaster, was a related company under Medicare guidelines.

## 2. *Kelly, Suba & Managed Risk*

Kelly was a certified public accountant and chief financial officer and vice-president of Healthmaster, second in command to Garrison. Kelly was also the trustee for Healthmaster's self-insured worker's compensation trust fund. In 1990, upon Kelly's recommendation, Garrison hired Suba as Healthmaster's insurance risk manager to reduce the worker's compensation claims and injuries of Healthmaster's three thousand employees.

---

[12] An organization is "related" to the healthcare provider through common ownership which "exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider." 42 C.F.R. § 413.17(b)(2). In general, Medicare will reimburse a home health care agency for only the cost of the supplies or services received from the related company. *See* 42 C.F.R. § 413.17(c); *United States v. Calhoon,* 97 F.3d 518, 525 (11th Cir. 1996), *cert. denied* 118 S.Ct. 44 (1997)(involving the reimbursement by Medicare of royalty fees paid to a hospital's related company).

That same year, Kelly and Suba formed their own company, Managed Risk, ostensibly to provide risk management for self-insured worker's compensation and health insurance funds. Suba owned twenty-four percent of Managed Risk and served as its president. Mrs. Kelly owned twenty-four percent. Majority ownership (fifty-two percent) was owned by two trusts controlled by Garrison and Kelly for the benefit of the Garrison children. Managed Risk operated out of Healthmaster's Augusta corporate offices yet it maintained a mailing (post office box) address in Atlanta. Business cards for Managed Risk listed an Atlanta answering service telephone number as its business number. Healthmaster was Managed Risk's primary client.

C. *The Components of the Conspiracy*

1. *The Conspiracy Itself (Count 1)*

The indictment charged that Garrison, Kelly, Suba, Healthmaster, Master Health and Managed Risk conspired together to defraud the United States through its Medicare program by fraudulently obtaining Medicare reimbursement for many different categories of items. Garrison was charged with Healthmaster's submission of cost reports that fraudulently sought reimbursement for her political contributions; for the wages of Healthmaster ghost employees (actually working at non-Medicare reimbursed companies); and for many of her own personal expenses. Garrison pleaded guilty to conspiracy and nine counts of making false statements. *See* note 8

*supra.* Count 1 of the indictment also charged Appellants with non-disclosure of related companies; with fraudulently obtaining workers compensation insurance premiums payable to Managed Risk from Preferred Care companies and fraudulently distributed to Managed Risk shareholders; with embezzling money from an employee benefit plan; and with concealing the source of the fraudulently obtained funds.

2. *The Preferred Care (PCC) Allegations (Counts 36-109)*

The Preferred Care allegations are touted to be the centerpiece of the Government's case. The allegations originate with Healthmaster's application for state (Georgia) approval of its self-insured worker's compensation program. Initially Healthmaster's application was rejected on the grounds of insufficient funds necessary to satisfy the State of Georgia's required two-to-one asset-to-liability ratio. Thereafter, to supplement its assets, Healthmaster listed as its workers' compensation program affiliate, the Preferred Care Companies (Preferred Care or PCC), a Garrison-owned holding company, and reapplied for self-insurance. *See* note 10 *supra.* Now armed with adequate assets to ensure payment of claims, the State of Georgia granted Healthmaster's re-application to self-insure, upon the condition that it post a $500,000 bond. Healthmaster posted the bond. Kelly was the principal signatory on the second application. The re-application pledged to pay workers' compensation claims out from an irrevocable trust funded upon an actuarial basis (the Augusta WC account

10

described below).

The Government alleges that Kelly, Suba and Managed Risk abused Healthmaster's affiliation with Preferred Care by illegally converting (for their own use) premiums intended for the benefit of Preferred Care employees. By so doing, Medicare was also defrauded. The scheme was accomplished, the Government contends, as follows: Kelly established a trust account at the Trust Company Bank in Augusta (the Augusta WC account).[13] Healthmaster administered its self-insured workers' compensation program through the Augusta WC account. From May 1990, through March 1993, Preferred Care was billed for and paid $1,420,237 in workers' compensation premiums. However, the Preferred Care checks were not mailed to or deposited in the Augusta WC account as pledged. Instead, the Preferred Care checks were mailed to Managed Risk's Atlanta post office box. Elizabeth Siegler, a Preferred Care employee, testified that she signed and mailed twelve premium checks to the Managed Risk Atlanta post office box (Counts 67-78); her predecessor, Debra Chance, testified that she signed the check used to buy the bond (Count 36) and thirty other premiums checks (Counts 37-66), all made payable to Managed Risk and mailed

_____

[13] The Augusta WC account funded a separate small claims account to pay employees' claims up to $25,000. Kelly and Suba established another account at the Midland Bank Trust Corporation in the Cayman Islands to provide coverage for claims greater than $25,000, up to $250,000. Commercial insurance coverage was obtained for Healthmaster employee claims above $250,000.

11

to the Atlanta post office box. The checks were endorsed and deposited into Managed Risk bank accounts in Atlanta and Marietta (Georgia), by Suba on dates after their issuance. Kelly and Suba applied the first $140,000 towards the purchase of the bond (Count 36). The funds were then distributed to Managed Risk shareholders (Mrs. Kelly, Suba, and the Garrison children's trusts). Between November 1990, and April 1993, Managed Risk distributed $1,719,000 (including the $1,420,237 in Preferred Care premiums) to its shareholders via twenty-seven checks signed by Suba. Mrs. Kelly received $640,000; Suba received $390,000; and the Garrison children's trusts each received $344,500. In the meantime, four things allegedly occurred: (1) Healthmaster properly deposited its workers' compensation premium checks into the Augusta WC account; (2) Medicare reimbursed Healthmaster for the checks; (3) Preferred Care employees made claims of $225,000 for their compensable injuries out of the Augusta WC account; and (4) Preferred Care employees were paid from the Augusta WC account, comprised of Medicare-reimbursed funds. The net result of this shell game, the Government contends, is that non-Medicare Preferred Care employees received $225,000 in Medicare-reimbursed funds.

(a) *Mail Fraud (Counts 36-78)*

The Government contends that Kelly and Suba committed mail fraud by using the United States mails to carry out their Medicare fraud scheme. As described above,

12

in accordance with a schedule prepared by Kelly, a Preferred Care employee signed and mailed twelve workers' compensation premium checks (Counts 67-78) to Managed Risk at its Atlanta post office box. Another Preferred Care employee signed the check used to buy the $500,000 Healthmaster bond required by the state (Count 36) and thirty premium checks (Counts 37-66). All checks were mailed to Atlanta or Marietta from Augusta, made payable to Managed Risk, and endorsed and deposited by Suba in Atlanta and Marietta.

(b) *Money Laundering (Counts 79-105)*

The indictment further charged Appellants with money laundering on the basis that the money in the Augusta WC account used to satisfy the $225,000 in claims consisted solely of Healthmaster premiums, reimbursed by Medicare. Thus, Government contends, Medicare funds were illegally used to satisfy (non-reimbursable) Preferred Care claims. In addition, the Preferred Care premiums were illegally converted by Managed Risk shareholders.

(c) *Money Laundering (Counts 106-109) by Kelly Only*

The Government alleged that Kelly further laundered the proceeds converted and distributed to Mrs. Kelly by investing these proceeds in stock and land.

3. *The Health Insurance Fund Allegations (Counts 112-123; 125-128)*

The Health Insurance Fund allegations arise out of a trust account (the Greenville

13

account) established by Healthmaster at the Carolina First Bank in Greenville, South Carolina for the benefit of its self-insured employee health and disability plan and administered by HDR, an independent third party administrator. Kelly was trustee of the Greenville account. He apparently determined the monthly $200,000 to $300,000 (in Medicare reimbursable) premiums paid into the Greenville account by Healthmaster.

(a) *Mail Fraud (Counts 112-115) by Kelly Only*

The Government alleged that Kelly, over a two-year period, disbursed $1,587,775 from the Greenville account for his own benefit and that of Master Health. He is alleged to have accomplished this scheme as follows: Kelly established another bank account in Augusta (the Augusta II account). He used false representations of being able to obtain a "higher yield" to induce HDR to mail Greenville account funds to him, which he deposited in the Augusta II account ($700,000; $500,000; $258,775; and $129,000). Kelly never returned the money to the Greenville account and improperly characterized two of the checks on Healthmaster's Annual Return, IRS Form 5500, as paid claims, rather than loans, transfers or investments.

(b) *Embezzlement from an Employee Benefit Plan (Counts 116-118) by Kelly Only for Master Health's Benefit*

Kelly then, the Government alleged, embezzled $960,583 through three transfers

14

from the Augusta II account funds (composed of Medicare reimbursed funds transferred from the Greenville account) and used them to purchase a $1 million certificate of deposit for Master Health (a non-Medicare company) in order for Master Health to meet new state minimum capitalization requirements for HMOs.

(c) *Embezzlement from an Employee Benefit Plan (Counts 119-121) by Kelly Only for Kelly's Benefit*

Similarly, the Government alleged, Kelly withdrew funds from the Augusta II account and deposited them into other accounts he controlled: (1) $78,400 payable for "data processing 91/92" to a "special activity account" established by Kelly for Employee Benefit Coordinators (EBC)[14] ; (2) $116,160 payable to the Managed Risk advertising account; and (3) one year after EBC dissolved, Kelly wrote a $71,256 check from the August II account and deposited it into the (now defunct) EBC's "special activity account."

(d) *Money Laundering (Counts 122-123, 125-128) by Kelly Only*

The indictment charges Kelly with money laundering the three checks described

---

[14]   EBC was a non-Medicare company established in 1987 by Kelly, Garrison and EBC's president, Peter Molloy, to market Master Health. Molloy was also vice-president of Healthmaster. He testified that he was unaware of the August II account or the EBC "special activity account." In fact, Molloy testified that Kelly had opened the EBC account with a signature card on which he signed both his name and Molloy's name, without Molloy's knowledge or permission. There is no record of any work, advertising or data processing, performed for the health insurance fund by either EBC or Managed Risk.

in (c) above. None of the three checks were reported on his income tax return:

a. *The $78,400 Check*

On the same day as the transaction discussed in (c) above, Kelly wrote a second $78,400 check on the EBC account payable to his brother's company, AMAT Telecommunications (AMAT), for non-existent data processing services.[15] Twelve days later, Kelly's brother wrote a $78,400 check from AMAT's account to Kelly's personal "rental account."

b. *The $116,160 Check*

Two weeks after Kelly transferred $116,160 from the Greenville account to the Augusta II account and deposited the funds in Managed Risk's advertising account, he moved $100,000 from the advertising account into his personal investment company, Icarus Investments, as a "loan." Two weeks after that, Icarus Investments bought South Carolina real estate for $44,870.

c. *The $71,256 Check*

After Kelly transferred $71,256 from the Greenville account to the Augusta II account and deposited it into EBC's special activity account, he then moved $85,000 from the special activity account to Icarus Investments' account as a "loan." One week later, Kelly transferred the amount remaining from the previous "loan" and

---

[15] Kelly was an officer of AMAT, but AMAT performed no work for EBC.

deposited the total [$140,000] into his personal bank account from Icarus Investments.

4. *The Sizemore Allegations - Mail Fraud (Counts 110-111)*

These counts are based upon an allegedly fraudulent invoice from Managed Risk to Healthmaster's Augusta WC account for a $125,000 "additional premium." The Government contends that Managed Risk agreed to purchase a $125,000 Trust Company Bank certificate of deposit for Sizemore Security to use as collateral for a bond necessary to qualify as a self-insured.[16] With supplemented assets, Sizemore Security would be able to self-insure and Managed Risk would obtain a new client. Managed Risk reimbursed itself for the certificate of deposit with Medicare-reimbursed Augusta WC account funds. Documentation was prepared, allegedly making it appear that the Augusta WC account owed a $125,000 "additional premium" to Managed Risk. These request documents were mailed to Trust Company Bank which in turn mailed the requested check to Managed Risk's Atlanta post office box. Thus, the Government contends, that Kelly, Suba and Managed Risk defrauded Medicare and the Augusta WC account by billing the account for a non-existing premium.

Kelly argues that there is no evidence of a scheme to defraud the (Medicare

---

[16] For its services, Managed Risk charged Sizemore a $4,000 fee and one percent monthly interest.

funded) Augusta WC account because he had investment authority over the account, and, after Sizemore Security repaid the loan for the certificate of deposit, Managed Risk returned the principal, with interest, to the Augusta WC fund. Suba claims he had no knowledge of the wording on the invoice and that it was incorrectly reflected as a "premium" instead of a "loan."

5. *The False Statements of Garrison, Kelly & Healthmaster*

*(a) The River Valley Allegations (Counts 11-26)*

The Government contends that Kelly, from 1989 to 1993, through false statements, fraudulently obtained $1,765,492 in Medicare funds, when Healthmaster purchased River Valley, an Albany, Georgia home health care agency, from four Galloway family members. The scheme was structured as follows: for the sale of River Valley, each Galloway was to receive a deposit of $100,000 plus $80,000 (per person) per year for ten years. Healthmaster, however, at Kelly's direction, completed the sales transaction by placing the Galloways on Healthmaster's payroll. They each received semi-monthly checks totaling $80,000, the amount they were due for the River Valley sale, as salary expense to Healthmaster yet they performed no work. Salary expenses were reimbursed by Medicare. There was testimony in the record that Kelly had been warned by a Healthmaster employee that this scheme would constitute Medicare fraud.

18

*(b)  The Concealment of Related Company Managed Risk Allegations (Counts 30-32)*

The Government charges that Kelly and Suba fraudulently concealed their ownership in Managed Risk from Healthmaster employees, although Managed Risk operated on the Augusta premises of Healthmaster, its largest client, and, Healthmaster paid Managed Risk's overhead and travel expenses.  In addition, Kelly did not identify Managed Risk as a "related company" on Healthmaster's cost reports for 1991, 1992, or 1993.  *See* note 12 *supra.*  Kelly, using Managed Risk as middleman, established the Augusta WC account, designed after Healthmaster's existing self-insured health program. *See* Part II C. 2. *supra*.  Managed Risk received fees of $101,844 in 1991 and $114,382 in 1992 for managing Healthmaster's Augusta WC and Augusta II accounts.[17]   In the meantime, Kelly and Suba continued to receive their Healthmaster salaries.  With Managed Risk posing as their middleman, the Government contends that Kelly and Suba could in essence double-bill Medicare for work they performed for Healthmaster since Managed Risk fees, like their Healthmaster salaries, were reimbursed by Medicare as operating expenses.

### III.  ISSUE ON APPEAL

---

[17] Managed Risk charged Healthmaster an eight percent commission for managing the Augusta WC account.  For managing the Augusta II account, Managed Risk received a base fee of $30,000, plus twenty-five percent of savings or minus twenty-five percent of additional costs.

The only issue with merit to discuss on appeal is whether there was sufficient evidence to support the convictions.[18]  *See* note 1 *supra.*

## IV.  STANDARD OF REVIEW

Sufficiency of the evidence is a question of law that we review *de novo.  United States v. Massey,* 89 F.3d 1433, 1438 (11th Cir. 1996), *cert. denied*, 117 S.Ct. 983 (1997).  The relevant question for a reviewing court, in judging the sufficiency of the evidence, is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319; 99 S.Ct. 2781, 2789 (1979).  We resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict; we will uphold the jury's verdict if a reasonable fact finder could conclude that the evidence establishes the defendants' guilt beyond a reasonable doubt.  *United States v. Starke,* 62 F.3d 1374, 1380 (11th Cir. 1995).  The Government need not disprove every hypothesis of innocence, as the jury is free to choose among reasonable constructions of the evidence.  *United States v. Waymer*, 55 F.3d 564, 570 (11th Cir. 1995).  The evidence may be sufficient even though it is not wholly inconsistent with every conclusion except that of guilt; the jury is free to

---

[18]  We do not discuss the boat scheme allegations involving bank fraud and money laundering (Counts 131-132).  The Government conceded in its brief at page 32 and at oral argument that there was insufficient evidence to support them as to Kelly.

choose among reasonable constructions of the evidence. *United States v. Zielie,* 734 F.2d 1447, 1458 (11th Cir. 1984).

## V. DISCUSSION

### A. *The Conspiracy (Count 1)*[19]

Kelly argues that the Government failed to prove a single, wrap-around conspiracy, or, if it proved anything, it proved multiple conspiracies, by impermissibly piling inference upon inference. He bases his argument on three theories: (1) that counsel for the Government conceded this issue when he stated in his closing argument that Suba "wasn't involved in every one of these subsidiary schemes and transactions, and there's no claim that he was;" (2) that Garrison, in her testimony for the Government, provided no evidence of her involvement in a single conspiracy nor gave any evidence implicating either Kelly or Suba in a single conspiracy; and (3) that the Government failed to prove requisite knowledge and criminal intent.

Individually, Suba tries to distance himself from his co-conspirators by claiming that there was no evidence of his involvement in six of the nine objects of the conspiracy listed in the indictment. He argues that his alleged involvement in the Preferred Care scheme (including money laundering) and the non-disclosures of

---

[19]    This case reminds one of the prisoner who sued the county when he was hurt during his escape because the county left the jail door open. Apparently, viewing Medicare as a cash cow, the temptation for these co-conspirators was just as great.

21

related companies (including Managed Risk) was entirely separate and distinct from the other multiple schemes alleged against Kelly and Garrison.

To sustain a conviction for conspiracy to defraud the United States, the Government must prove the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it. *United States v. Kammer*, 1 F.3d 1161, 1164 (11th Cir. 1993). However, if the proof shows the defendant knew the essential objective of the conspiracy, it does not matter that he did not know all its details or played a minor role in the overall scheme. *United States v. Walker*, 720 F.2d 1527, 1538 (11th Cir. 1983). In addition, "participation in a criminal conspiracy need not be proved by direct evidence; a common purpose or plan may be inferred from a development and collocation of circumstances." *United States v. Khoury,* 901 F.2d 948, 962 (11th Cir. 1990) (*quoting Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457 (1942)). The Government need only produce sufficient evidence that the defendants conspired to commit a single object. *See Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466 (1991); *United States v. Stone*, 9 F.3d 934, 938-939 (11th Cir. 1993). To sustain a conspiracy conviction therefore, we must conclude that a reasonable fact finder could determine that: (1) an agreement existed among two or more persons; (2) that the defendant[s] knew of the general purpose of the agreement; and (3) that

the defendant[s] knowingly and voluntarily participated in the agreement.  *United States v. Ramsdale*, 61 F.3d 825, 829 (11th Cir. 1995).  Variance between allegations and proof is reversible only when the defendant is actually prejudiced.  *See United States v. Coy,* 19 F.3d 629, 634 (11th Cir. 1994).

Under these legal principles, the record reflects that the evidence proved an overarching conspiracy to defraud Medicare.  A reasonable juror could justifiably find, beyond a reasonable doubt, that the Medicare fraud conspiracy alleged was the Medicare conspiracy proven.[20]  The record indicates that the district court instructed the jury to consider the evidence on each offense and each defendant separately.  In addition, the evidence amply demonstrates Kelly's involvement in any conspiracy that may have existed.  *See Khoury*, 901 F.2d at 962.  It matters not that Suba or Managed Risk may not have known all the details of the conspiracy or played a lesser role in the overall scheme.  *See Walker,* 720 F.2d at 1538.  We conclude that actual prejudice as to Kelly, Suba and Managed Risk is absent; hence reversal on this issue is unwarranted.  *See Coy,* 19 F.3d at 634.

B.  *The Preferred Care (PCC) Allegations (Counts 36-109)*

    1.  *Mail Fraud (Counts 36-78)*

---

[20]  Notwithstanding, the district court gave an appropriate instruction on multiple conspiracies and the jury is presumed to have followed it.  *See United States v. Stone,* 9 F.3d 934, 938-39 (11th Cir. 1993).

Kelly contends that the evidence does not support his Preferred Care mail fraud convictions for three reasons: (1) that he and Suba were "under no duty or obligation" to pay Preferred Care claims with Preferred Care money, hence, no crime was committed; (2) that Preferred Care premiums included $568,000 in other (general liability or commercial) insurance payments, a matter not alleged as mail fraud in the indictment; and (3) that, while conceding that the last twelve premium checks were mailed (Counts 67-78) (Kelly's assistant testified that she mailed them), he disputes evidence that the remaining were mailed earlier (Counts 36-66).

Suba claims that the evidence does not support his Preferred Care mail fraud convictions because he had no fraudulent intent and that Preferred Care, as Garrison's alter ego, was not a "victim" for 18 U.S.C. § 1341 purposes. There was no evidence Suba claims that, as Healthmaster's "risk manager," he knew that Healthmaster's insurance premiums were being reimbursed by Medicare or that he played any part in the Medicare reimbursement process itself, as others were responsible for preparing Healthmaster's cost reports submitted to Aetna.[21]

The Government argues that a reasonable juror could find that Kelly, Suba, and Managed Risk used the United States mails to defraud Medicare when Preferred Care

---

[21] There is evidence in the record that Healthmaster's vice-president, Mike Haddle, prepared the cost reports with information supplied by others. Suba claims that "his name never came up" in this context as one of the information suppliers.

24

mailed checks totaling $1,420,237 to Managed Risk's Atlanta post office box. When a Preferred Care employee made a legitimate workers' compensation claim, Kelly and Suba covered up its house of cards, the Government contends, by paying the claim from the Augusta WC fund comprised of Medicare money. Meanwhile, the $1,420,237 was converted and distributed by Suba to himself, Mrs. Kelly and the Garrison children's trusts. If the claims were not paid, the Government argues, the Managed Risk shareholders would not have been able to keep pocketing the Preferred Care premiums and their house of cards would have folded.

The mail fraud statute prohibits devising a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses," which is furthered by use of the mails. 18 U.S.C. § 1341; *see also United States v. Funt,* 896 F.2d 1288, 1292 (11th Cir. 1990). To prove mail fraud, the Government must show that the defendant (1) intentionally participated in a scheme to defraud and (2) used the mails to execute the fraudulent scheme. *See United States v. Hooshmand,* 931 F.2d 725, 731 (11th Cir. 1991). The Government need not produce direct proof of scienter in a mail fraud case, however; circumstantial evidence of criminal intent can suffice. *United States v. Hawkins,* 905 F.2d 1489, 1496 (11th Cir. 1990). The Government must establish only that the fraudulent scheme existed; conviction for mail fraud "need not rest on the success of the fraudulent scheme." *United States v.*

*Wingate,* 997 F.2d 1429, 1433 (11th Cir. 1993). Guilty knowledge can rarely be established by direct evidence, especially in respect to fraud crimes which, by their very nature, often yield little in the way of direct proof. *See United States v. DesMarais,* 938 F.2d 347, 352 (1st Cir. 1991).

In this case we conclude that the mails were used and the United States was defrauded at the conclusion of the following sequence of events: (1) Healthmaster (reimbursable) premiums were deposited into the trust fund; (2) Preferred Care (non-reimbursable) premiums were not paid into the trust fund, although Appellants had an apparent fiduciary obligation to do so, but were siphoned off via the mails to Managed Risk shareholders; (3) Preferred Care employees made $225,000 in claims which were paid by the trust; (4) the money in the trust used to pay the non-reimbursable claims was comprised of Medicare reimbursed money. 18 U.S.C. § 1341.

We have examined the record as to the mailing of each of the forty-three checks charged in the indictment. We conclude that direct testimonial evidence of mailing exists as to Counts 67-78, and strong circumstantial evidence of mailing exists as to Counts 36-66. *See Waymer*, 55 F.3d at 570-571. As to Kelly, his arguments that no crime was committed because he had "no duty" to deposit the Preferred Care premiums in the trust fund, and, that the Preferred Care premiums contained general liability or commercial insurance are without merit. As to Suba, we find that there is

26

ample circumstantial evidence to support the idea that he knew exactly what was going on. Although he claims he "was only a risk manager for Healthmaster," he also managed and owned part of Managed Risk. Suba knew and participated in using, as Managed Risk's business address, that of an Atlanta post office, while operating Managed Risk on Healthmaster's Augusta premises. Strong circumstantial evidence is that the Preferred Care checks were addressed to this Atlanta post office box. Suba endorsed and deposited the Preferred Care checks in Atlanta or Marietta banks, other strong circumstantial evidence of mailing. Suba signed the twenty-seven checks distributing Preferred Care money to the Managed Risk shareholders, including a hefty $390,000 profit to himself.[22]

The jury could reasonably infer Suba's guilty knowledge and participation in the scheme to defraud Medicare from the whole of the evidence presented and strong circumstantial evidence that the checks were mailed. Given the widespread nature of the Medicare fraud from these Preferred Care counts and the large amount of extra revenue generated to Suba and Kelly personally, only a conscious course of calculated ignorance could have kept Suba from knowing the truth. In fact, we think that Suba played more than a minor role in this operation. It is clear that he had more understanding of the underlying unlawful act than he cares to admit and that he was

---

[22] A substantial dividend rate of return for a shareholder making only a $10,000 investment.

a knowing and willing participant in the conspiracy to defraud Medicare through this house of cards.

The same is true for Kelly, who, second only to Garrison, held the reins of corporate control as chief financial officer of Healthmaster and had hands-on involvement in the operation of the business. Our review of the record persuades us that there was sufficient evidence to support both Kelly's and Suba's convictions on these counts. *See United States v. O'Brien,* 14 F.3d 703, 708 (1st Cir. 1994)(where extensive circumstantial evidence "formed a river of proof" supporting a jury's conviction of an ambulance service owner on 420 counts relating to Medicare fraud).

*2. Money Laundering (Counts 79-109)*

Kelly concedes that the financial transactions alleged in the money laundering counts occurred. He claims that money laundering did not occur because the financial transactions did not involve the proceeds of mail fraud.[23] Suba does not address this issue in his briefs other than in a sentencing context.

---

[23] Kelly also claims that (1) his financial transactions had no affect upon interstate commerce; and (2) that his conviction for money laundering cannot be upheld because those counts involved more money ($1.7 million) than the mail fraud counts ($1.4 million). Both of these arguments are meritless. First, there is evidence that his transactions had an effect upon interstate commerce. *See* 18 U.S.C. § 1956(6) (defining financial institutions as one specified in 31 U.S.C. § 5312(a)(2), including a wide range of institutions, as the district court instructed the jury). Second, the law in this circuit is clear that "where funds involved in the transaction are derived from a commingled account of which only a part comes from 'specified unlawful activities,'" money laundering convictions can be upheld. *See United States v. Cancelliere*, 69 F.3d 1116, 1120 (11th Cir. 1995).

The Government contends that a reasonable juror could find that Kelly and Suba laundered the mail fraud Preferred Care premiums by first depositing them in Managed Risk account and then distributing them to its shareholders. As evidence of Kelly's criminal intent, the Government points to his manipulation of the Garrison children's trust distribution deposits. Kelly forged the trustee's name on the signature card (of an account of which the trustee had no knowledge) and then forged the trustee's endorsement on the checks, also without his knowledge or permission. Laundering continued when Suba and Kelly deposited their distributions into their personal bank accounts. Kelly engaged in further money laundering by investing with two brokerage houses and purchasing South Carolina real estate.

In order to prove the crime of money laundering, the Government must prove that Kelly and Suba "conduct[ed] . . . a financial transaction which in fact involve[d] the proceeds of specified unlawful activity . . . ." *See* 18 U.S.C. § 1956; *United States v. Cancelliere,* 69 F.3d 1116, 1119 (11th Cir. 1995). We think the evidence is clear that a reasonable juror could find that the Government sustained its burden of proving beyond a reasonable doubt that Kelly and Suba laundered the Preferred Care premiums at issue in the mail fraud counts by depositing them into Managed Risk accounts and distributing them to themselves as shareholders. Kelly's unlawful activity went two steps further when he forged the trustee's signature and

29

endorsements and invested the proceeds in securities and real estate. Neither were these money laundering transactions "open and notorious" as Kelly contends. *See United States v. Dobbs,* 63 F.3d 391 (5th Cir. 1995). We find no error regarding this issue.

C. *The Health Insurance Fund Allegations (Counts 112-123, 125-128)*

1. *Mail Fraud (Counts 112-115)*

Kelly contends that the Government failed to prove mail fraud because it failed to prove that he knowingly and willfully embezzled from the Greenville account. He claims that there is no evidence that HDR transferred the funds from the Greenville account to the Augusta II account based his false statement that he could obtain a "better yield" elsewhere, or that his statement was material in influencing HDR's decision to comply with his request.

The Government argues that mail fraud was committed when Kelly requested that HDR issue four (Medicare-reimbursed) Greenville account checks and mail them to him for deposit in the Augusta II account, creating a $1,587,775 "slush fund." It claims that Kelly's "better yield" statement was relevant because it falsely implied that he planned to use the money to benefit the trust fund when in fact he used it to benefit himself and Master Health.

To prove Kelly violated the mail fraud statute, the Government must show that he

intentionally participated in a scheme to defraud and used the United States mails to carry out that scheme or artifice. 18 U.S.C. § 1341; *see Waymer*, 55 F.3d at 568. And, although proof of specific intent to defraud is necessary, *id.*, "circumstantial evidence of criminal intent can suffice." *United States v. Cox*, 995 F.2d 1041, 1045 (11ᵗʰ Cir. 1993). *See also* Part V.B.1 *supra.*

Viewing the evidence in the light most favorable to the Government and resolving all reasonable inferences and credibility evaluations in favor of the jury's verdict, we agree. *See Massey,* 89 F.3d at 1438. The Government need not produce direct proof of scienter in a mail fraud case, circumstantial evidence will suffice. *See Hawkins,* 905 F.2d at 1496. Kelly's false statement constituted circumstantial evidence of criminal intent. *Id.; see Cox*, 995 F.2d at 1045. We think the record is clear that a reasonable juror could conclude that Kelly committed mail fraud when he caused the Greenville account Medicare funds to be mailed to and deposited in the Augusta II account.

2. *Embezzlement from an employee benefit plan (Counts 116-121)*

Kelly contends that there is no evidence to prove that he acted willfully or knew that his use of the money in the Augusta II account violated any legal duty. He claims that the embezzlement conviction should be set aside because the Government failed to prove the requisite criminal intent. The Government claims that the evidence easily

demonstrated that Kelly embezzled $1,587,775 from the Greenville account, through the Augusta II account, both for his own use and for the benefit of Master Health.

A charge of embezzlement from an employee benefit fund requires that the Government prove that Kelly is a person who "embezzles, steals, or unlawfully and wilfully abstracts orconverts to his own use or to the use of another, any moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan . . . ."[24] 18 U.S.C. § 664. Section 664 requires a showing of fraudulent intent to sustain a conviction. *See United States v. Andreen,* 628 F.2d 1236 (9th Cir. 1980). In *United States v. Snyder*, 668 F.2d 686 (2d Cir. 1982), the Second Circuit recognized that "[t]he only real question . . . was whether [the defendant] took [the funds] with the requisite criminal intent. *Id.* at 690.

We conclude that the evidence was sufficient to sustain a conviction for violating section 664 beyond a reasonable doubt. A reasonable jury could have found that Kelly possessed the specific criminal intent necessary to satisfy the statute and that he embezzled Medicare money from an employee benefit plan for his own use and that of Master Health. He used the funds to purchase a $1 million certificate of deposit for

---

[24] "The legislative history of Section 664 clearly indicates that its intended purpose was to preserve welfare funds for the protection of those entitled to their benefits." *United States v. Santiago,* 528 F.2d 1130, 1133 (2d Cir. 1976) *citing,* H.R.Rep. No. 87-998 (1961), *reprinted in* 1962 U.S.C.C.A.N. 1532. This important public policy purpose is the underlying momentum for the enactment of section 664. *United States v. Somerstein*, 971 F.Supp. 736, 748 (E.D.N.Y. 1997).

Master Health which had been unable to meet Georgia's new capitalization requirements and took three checks ($116,160; $78,400; $71,256) for his own benefit. Kelly's argument that there was no evidence that these funds wouldn't someday be returned to the Augusta II account is without merit. *See United States v. Wuagneux,* 683 F.2d 1343, 1359 (11th Cir. 1982)(citations omitted)(where the possibility that funds will be recovered does not preclude criminal liability). We find no error on this issue.

3. *Money Laundering (Counts 122-123, 125-128)*

Kelly contends that since he should be acquitted on the mail fraud and embezzlement counts, he is therefore entitled to a judgment of acquittal on the money laundering counts. The Government points to the record and to the fact that Kelly did not report the three checks on his income tax return.

In order to prove that Kelly laundered money in connection with the mail fraud and embezzlement counts, the Government is required to show that the property involved in a financial transaction represented proceeds of some form of unlawful activity, 18 U.S.C. § 1956 (a)(1); that Kelly conducted or attempted to conduct such financial transaction with the intent to evade income taxes, 18 U.S.C. § 1956 (a)(1)(A)(ii); knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of those proceeds. 18

33

U.S.C. §1956 (a)(1)(B)(i).

As Kelly did not report these three checks on his income tax return, the jury's conclusion that Kelly laundered these Medicare monies is supported by a reasonable construction of the evidence.

D. *The Sizemore Security Mail Fraud Allegations (Counts 110-111)*

Suba claims that he was not involved in wording the invoice for the $125,000 certificate of deposit for Sizemore Security as an "additional premium" instead of a "loan" but that Kelly's initials and jottings were on the invoice and the request form. Kelly claims that no fraud was proven because the loan was repaid.

The Government claims that the evidence clearly indicates Kelly's intent to defraud when he mailed a "request for $125,000 check"/invoice from the Augusta WC fund to the Trust Company Bank. Trust Company Bank in turn mailed a $125,000 check to Managed Risk and Managed Risk used these funds for its purchase of a $125,000 certificate of deposit for Sizemore Security. Repayment was made only after the investigation was ending, three months before the indictment was issued.

Repayment in the face of litigation does not show a lack of fraudulent intent. *United States v. Sirang,* 70 F.3d 588, 595 (11th Cir. 1995). Trust Company Bank mailed the Augusta WC check comprised of Medicare funds to Managed Risk's Atlanta post office box over which Kelly and Suba had control. The jury was entitled

34

to conclude that Kelly and Suba used the United States mails to manipulate Medicare funds in the Augusta WC account for the benefit of themselves and their company. There is no error on this issue.

E.  *The False Statement Allegations - (River Valley (Counts 11-26) and the Concealment of Related Company Managed Risk Allegations (Counts 30-32))*

Kelly contends that the Government failed to prove the essential elements of these counts based upon alleged "false statements" in the cost reports, i.e., treating the money paid to the Galloways for the purchase of River Valley as a salary expense, and failing to disclose that Healthmaster and Managed Risk were related companies on 1991, 1992, and 1993 cost reports. He bases his contention on the premise that he did not prepare the cost reports and that "[i]t is beyond dispute that the Medicare regulations are a complicated morass of compliance rules."

The Government counters that Kelly, himself, is a certified public accountant, was chief financial officer and second-in-command of Healthmaster and that he was warned by a Healthmaster employee that the River Valley scheme would constitute Medicare fraud because Medicare would in essence be illegally reimbursing Healthmaster for the cost of its purchase of River Valley. In addition, the evidence clearly shows that Kelly concealed the relationship between Healthmaster and Managed Risk by using an Atlanta post office box address and an Atlanta answering

service telephone number.

In order to prove that Kelly made false statements in violation of 18 U.S.C. § 1001, the Government need only show that Kelly knowingly and willfully concealed a material fact by any trick, scheme, or device, or made or used a false document knowing that it contained any false, fictitious, or fraudulent statement or entry. 18 U.S.C. § 1001. A reasonable jury could conclude from the substantial evidence presented on these counts that Kelly violated the false statements statute.

## VI. CONCLUSION

Based upon the foregoing, the convictions and sentences of Suba and Managed Risk are affirmed. As to Kelly, except as to Counts 131 and 132 which are reversed, his conviction is also affirmed. We remand for Kelly's resentencing on Counts 131 and 132 in accordance with this opinion.

AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR RESENTENCING AS TO KELLY.