[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-10469

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 21, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-00345-CR-KD

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

KENNETH DAVID WALL,
LAURENCE PETER SUTLEY,

Defendants-Appellants
Cross-Appellees.

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVE EUGENE RUSSO,

Defendant-Appellant.

Appeals from the United States District Court
for the Southern District of Alabama

**(July 21, 2008)**

Before DUBINA and BARKETT, Circuit Judges, and SCHLESINGER,[*] District Judge.

DUBINA, Circuit Judge.

Appellants Steven Eugene Russo ("Russo")(Mayor of Orange Beach, Alabama), Laurence Peter Sutley ("Sutley")(City Attorney of Orange Beach, Alabama), and Kenneth David Wall ("Wall")(a developer in Orange Beach, Alabama) appeal their various convictions involving a scheme to bribe Mayor Russo. A jury found Russo, Wall, and Sutley guilty of conspiring to commit honest services fraud. In addition, the jury found each of the Appellants guilty of various substantive mail and wire fraud counts. The jury found Russo and Sutley guilty of conspiracy to obstruct justice and found Russo guilty of one substantive obstruction count. The district court also ordered Russo to criminally forfeit some of his ill-gotten gains. The district court granted Wall's motion for judgment of acquittal on the conspiracy conviction, but let stand his substantive convictions.

---

[*]Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

The Appellants appeal their convictions, and Russo appeals the criminal forfeiture. In addition, the United States cross-appeals the district court's grant of Wall's motion for judgment of acquittal on the conspiracy count, Wall's sentence, and the district court's denial of forfeiture as to Sutley.

## I. BACKGROUND

Russo served as the mayor of Orange Beach, Alabama (the "City"), from 1998 to 2006. As mayor, Russo was one of the six people who voted on development applications (the five others were the members of the city council). In order to gain approval for development applications from the City, four of the six voting members must vote for the project.

Jim Brown ("Brown") was a successful local developer in the City who entered into an illicit relationship with Russo whereby Brown would provide things of value to Russo in return for Russo's support of Brown's development projects. The government originally charged Brown in the indictment with Russo, Sutley, and Wall. Brown pleaded guilty and cooperated with the Government as the chief witness against the Appellants.

The alliance between Brown and Russo began in 2003. At that time, Brown did some work on Russo's house and when Russo offered to pay him, Brown declined, saying the mayor should consider it a campaign contribution. Instead of

3

objecting, Russo asked Brown to screen in his porch. Over the next year, Brown tiled Russo's porch, repaired a roof and fence, installed a sprinkler system, landscaped the yard, added drainage lines, put in electric fans, and installed a generator. The total cost of these services was approximately $15,000, and Russo neither offered to pay nor paid Brown for any of his work.

The record reveals that in the summer of 2004 Russo asked Brown to find "some way he could make some money." Russo told Brown that "he was tired of making money for all these people; he wanted to make some." Brown did not initially agree to help Russo, but Russo persisted, and Brown "was afraid to say no" because "he was the mayor and I had to have his support to continue to work." At this time, Brown had an option to purchase a house in neighboring West Beach that he planned to tear down, rebuild, and resell. Brown decided to let Russo become his partner on this project even though Brown "was going to be doing all the work and getting half the money."

A few days later, Russo called Brown and asked him to bring Sutley into the housing venture. To complete the venture, Sutley, Russo, and Brown used a limited liability corporation entitled "American Hot."[1] American Hot borrowed

---

[1] Sutley originally established American Hot in the name of his secretary, Dianne Brown, for one of his clients who ultimately did not use it. After Sutley, Brown, and Russo decided to use American Hot for their venture, Dianne Brown assigned her interest to Sutley, Brown, and Russo.

$1.6 million to buy the West Beach property and pay for the construction of a new house. All three partners signed the note. However, Brown arranged for the loan and covered all the closing costs. Sutley contributed his share of the first mortgage payment and insurance, but Russo paid nothing. As the West Beach deal was coming together, Brown repeatedly talked to Russo about the ethical issues raised by the alliance, and asked that he speak with an ethics advisor. Russo and Sutley both told Brown that Sutley was working on getting a ethics letter, but Brown never received a letter.

In September 2004, Hurricane Ivan destroyed the existing West Beach house. As a result, each partner received approximately $93,000 in insurance proceeds.

In 2004, city councilman Jerry Davidson ("Davidson") considered challenging Russo for mayor. Davidson was already a member of the city council and a reliable anti-development vote. As such, Brown did not want Davidson to be elected mayor. Brown learned from Davidson's daughter that the councilman would forgo the race if he could sell his house and relocate. As a result, Brown offered to buy Davidson's house for $200,000 more that it was worth, and also agreed (per Davidson's demand) to buy another house in a neighboring town.

When Brown talked to Russo about the plan to buy Davidson's house,

Russo was pleased but told Brown that he did not trust Davidson to keep his word. Russo thus made some calls to determine the election filing deadlines but, failing to get an answer, put Sutley on the case. Sutley phoned Brown, gave him the filing deadline, and told him not to close before the deadline passed. Ultimately, the plan worked, and Davidson left town without challenging Russo for mayor.

Shortly thereafter, the City awarded Brown a contract to clear hurricane-related debris. The contract included both a clean-up fee ($68,562) and a management fee ($115, 793). Brown did the clean-up, but the City managed the project. However, Brown still received the entire amount for both clean-up and management. The project manager for the clean-up site (a City employee) told Brown "what a great friend" he had in Russo. When Brown asked Russo about the contract, Russo said the money could help defray the cost of the "Davidson deal." Russo also asked Brown how much money Brown expected to make from the clean-up contract. Brown told Russo that he was going to make about $50,000 and asked Russo how he wanted to be paid. Russo told Brown that Brown did not need to pay him.

In spite of Russo telling Brown he did not need to pay him, Russo later called Brown and asked him for "10 of the 50" to help with a new car. Russo told Brown to make the check out to Crystal McDonald (Russo's girlfriend) so that

"nobody would find it." Brown agreed because "it was the only way [he] was going to get out of there." Brown also agreed that the remaining $40,000 would go toward a new house he would build for Russo.

In the summer of 2004, Brown and Wall were working on a very large condominium/hotel project called the Water Club. The value of the project was expected to be around $300 million. Because of the size of the project, Brown expected opposition on the city council.[2] In the spring of 2005, Brown and Wall pitched the Water Club project to Merrill Land Company (a land development firm) and when asked about the required rezoning, Wall assured Merrill's representative that Brown "had City Hall in pretty good shape" and that they "could guarantee the zoning."[3] As part of the Water Club project, Wall and Brown needed to acquire a neighboring parcel of beachfront land. To get this property, they agreed to give the owners of the beachfront land a parcel on the outskirts of the Water Club, which they also agreed to develop. One condition of the land swap was the approval of the development on the non-waterfront property. Russo voted to approve the new development, and the land swap occurred.

Later in 2005, Russo learned of two waterfront lots that were for sale by

---

[2] A city councilwoman testified that the project was controversial. Brown testified that "it was going to be hard" to get approval and that he was counting on Russo.
[3] A Merrill representative testified that he was surprised by Wall's guarantee because he had never heard of such a thing in his twenty-five years in the real estate business.

Claudia Bankester for $900,000. Russo asked Brown to buy the property with him, and Brown agreed. Russo and Brown ultimately entered into an agreement to purchase the Bankester lots for $1.2 million. Brown agreed to put up the collateral and personally guarantee the full amount of the loan. Brown and Russo planned to then re-sell the lots and split the profits. Two weeks after signing the contract, Brown told Wall about the deal.

During this same time, Brown and Wall were partners with Keith Chunn and Don Chunn, who owned a company called Deck Investments. Under their arrangement, Wall and Brown brought real estate proposals to Deck Investments. If the group agreed on a project, Deck would finance it, Brown would build it, and Wall would sell it. At the time of the contracting for the Bankester lots, Deck held 72 acres of landlocked property and was looking for contiguous waterfront property to provide access to the gulf. Realizing that the Bankester lots met Deck's needs, Brown and Wall agreed that Brown had to get out of the deal. Brown assigned his interest in the property to Russo and then asked Russo what profit he expected from the property. Russo said he wanted to make $400,000, and Deck ultimately agreed to pay Russo $1.6 million for the property. Wall did not tell the Chunns about the original sale of $1.2 million or that Brown was involved in that deal. Furthermore, after the $1.6 million sale, which netted Russo

8

$400,000, Wall told Brown "to be sure the mayor knew who made the deal happen." Ten days before the $1.6 million sale, Brown and Wall filed their application for the Water Club project.

Also during the spring of 2005, Brown purchased a lot in a complex called "Romar Vista" for $1.6 million. At the time Brown purchased the lot, other Romar Vista developers were trying to get rezoning for a new condominium, but Brown's lot was not part of the plan. Brown asked Russo for his help with getting Brown's lot to be part of the rezoning plan. Russo called the project's lawyer and reported to Brown that his lot would be part of the rezoning and that he should not sell it to the developers for less than $2.2 million. On August 2, 2005, the council approved the Romar Vista rezoning, including Brown's lot. Thirty minutes before the vote, Brown signed a contract selling his lot to the other developers for $2.2 million. Brown agreed to give Russo a $75,000 management fee when the sale closed.

In addition to the $75,000, Brown also agreed in the fall of 2005 to build Russo a new house at cost (a $160,000 value for Russo). Russo bought the land for his house with the $400,000 he made off the Bankester lots deal and planned to finance the construction with the $40,000 remaining from the $50,000 profit Brown made on the hurricane cleanup, as well as the $75,000 management fee for

9

Romar Vista. Before Brown could begin building the house, the Government indicted Brown, Sutley, Wall, and Russo.

The first superseding indictment against the Appellants, which was returned on March 31, 2006, sought forfeiture of the American Hot proceeds. That day, Sutley called Brown twice and told him to move the money out of the American Hot account. He told Brown that "the feds are trying to get the house" and the bank account and that "it was urgent" to get the money out "before the government got the money." Brown complied and directed the bank to transfer the proceeds in the American Hot account into a different account. Russo also called the bank and told the branch administrator that he would like to open a new account because he believed that his account was going to be frozen because of a new indictment. As a result, Russo transferred $95,179 (which included the $93,000 insurance proceeds from the waterfront house destroyed by Hurricane Ivan) into a new account in the name of Russo's girlfriend, Crystal McDonald.

The jury returned guilty verdicts against Russo on the following counts: conspiracy to commit honest services fraud (Count 1); substantive honest services violations arising out of American Hot (Counts 3-6, 8, 9); substantive honest services violations arising out of the sale of the Bankester lots (Counts 12-16, 18-21); substantive honest services violations arising out Russo's personal use of

10

campaign funds (Counts 22-25); conspiracy to obstruct justice (Count 27); and obstruction of justice (Count 28). The jury returned guilty verdicts against Sutley on the following counts: conspiracy to commit honest services fraud (Count 1); substantive honest services violations arising out of American Hot (Counts 3-6, 8, 9); and conspiracy to obstruct justice (Count 27). The jury returned guilty verdicts against Wall of conspiracy to commit honest services fraud (Count 1) and substantive honest services violations arising out of the sale of the Bankester lots (Counts 12-14, 17, 20).

## II. DISCUSSION

*A. Russo's Honest Services Convictions*

1) Alleged Pleading Failures

Russo asserts that his honest services convictions surrounding American Hot and his personal use of campaign funds must be reversed because of pleading failures. "We review *de novo* whether an indictment sufficiently alleges a statutorily proscribed offense." *United States v. Walker*, 490 F.3d 1282, 1296 (11th Cir. 2007) (citation omitted). "The indictment must contain a plain, concise, and definite written statement of the essential facts constituting the offense charge." *Id.* (internal quotations and citation omitted). "An indictment is sufficient if it (1) presents the essential elements of the charged offense, (2)

11

notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution of the same offense." *Id.* (internal quotations and citation omitted).

The American Hot counts charged Russo and Sutley with depriving the citizens of Orange Beach of their right to Russo's honest services as mayor by receiving from Brown things of value "in return for Russo's and Sutley's agreements to perform acts benefitting Brown and Wall." Russo argues that the sentence structure in the indictment indicates that the Government alleged Russo violated 18 U.S.C. Section 1346 in two ways: (1) by agreeing to take bribes from Brown, and (2) because Sutley agreed to take bribes from Brown. Russo argues that this second theory of liability is erroneous and because the jury returned a general verdict on the American Hot counts, we must reverse his convictions.

We are not persuaded by Russo's argument. "[W]hen analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction." *United States v. Poirier*, 321 F.3d 1024, 1029 (11th Cir. 2003). We conclude that the indictment is sufficient as to the American Hot counts because it clearly notified Russo of the offenses for which he was charged and set forth the elements of these offenses. The common sense construction of the

12

indictment is that the Government charged Russo because he took bribes. The Government did not base the indictment against Russo on the allegation that Sutley may have accepted bribes. Furthermore, as we have stated before, "[l]inguistic precision is not required" in an indictment. *United States v. deVegter*, 198 F.3d 1324, 1330 (11th Cir. 1999).

Next, Russo argues that his honest services convictions stemming from his personal use of campaign funds must be reversed because such conduct is not covered by the statute. "To prove 'honest services' mail fraud, the Government must show that the accused intentionally participated in a scheme or artifice to deprive the persons or entity to which the defendant owed a fiduciary duty of the intangible right of honest services, and used the United States mails to carry out that scheme or artifice." *United States v. Browne*, 505 F.3d 1229, 1265 (11th Cir. 2007) (citation omitted). The Government argues that Russo's use of his campaign funds for personal expenditures deprived the public of his honest services. We disagree. Though Russo's actions may violate some other law, his actions do not fall within the realm of honest services fraud. The only people who were possibly deprived of honest services from the use of campaign funds for personal expenditures were Russo's campaign contributors. However, Russo did not owe his campaign contributors an independent fiduciary duty, and thus, any

13

deprivation of honest services that occurred is not covered by the statute. We

therefore vacate Russo's convictions on Counts 22-25.

2) Sufficiency of the Evidence

Russo argues that the Government presented insufficient evidence to

establish *quid pro quo* bribery.[4] "We review . . . *de novo* the sufficiency of the

evidence supporting a criminal conviction." *Walker,* 490 F.3d at 1296 (citation

omitted). "In doing so, we review the evidence in the light most favorable to the

government, drawing all reasonable inferences and making all credibility choices

in the government's favor." *Id.* (internal quotations and citation omitted). "We

will reverse a conviction based on insufficient evidence only if no reasonable trier

of fact could have found guilt beyond a reasonable doubt." *Id.* (internal quotations

and citation omitted).

The evidence in this case was clearly sufficient for a reasonable jury to find

Russo guilty beyond a reasonable doubt. Russo repeatedly asked Brown for both

in-kind contributions and assistance in making money. *See Walker*, 490 F.3d at

1297-98 (legislator's repeated request for lobbyist's business favors evidence his

fraudulent intent). The record is also replete with references to instances where

---

[4] Russo also argues that the Government has the burden of connecting specific gifts to specific acts on his part. Russo offers no support for this argument, and we conclude that it is without merit.

14

Russo voted on Brown-related projects without disclosing his relationship with Brown. *See United States v. Hasner*, 340 F.3d 1261, 1271-72 (11th Cir. 2003) (failure to disclose material information evinced official's fraudulent intent). Furthermore, a city employee told Brown that he had a good friend in Mayor Russo when discussing the hurricane clean-up project, and Russo even told Brown that the hurricane clean-up contract would help offset the cost of Brown paying for Davidson to leave town. Given the repeated gifts from Brown to Russo and Russo's numerous acts benefitting Brown, we conclude that there was more than enough evidence from which a reasonable juror could find Russo guilty beyond a reasonable doubt.

## B. *Sutley's Honest Services Convictions*

In order to be convicted of honest services conspiracy, the Government must show the existence of: (1) an agreement between two or more persons to achieve an unlawful objective; (2) a defendant's knowledge of and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy. *United States v. Suba*, 132 F.3d 662, 672 (11th Cir. 1998). Sutley argues that the evidence is insufficient to show that he knew that Brown was bribing Russo or that he voluntary participated in the conspiracy.[5]

---

[5] Sutley also argues that the Government's conflict of interest theory of criminal liability for Sutley is invalid. Because we conclude that the evidence is sufficient to sustain his

15

"We review . . . *de novo* the sufficiency of the evidence supporting a criminal conviction." *Walker,* 490 F.3d at 1296 (citation omitted). "In doing so, we review the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor." *Id.* (internal quotations and citation omitted). "We will reverse a conviction based on insufficient evidence only if no reasonable trier of fact could have found guilt beyond a reasonable doubt." *Id.* (internal quotations and citation omitted).

The Government presented the following evidence at trial: (1) Russo and Sutley were close personal friends who had a long personal and professional relationship; (2) Russo called Brown and told him that Sutley wanted to make some money; (3) Sutley, Brown, and Russo joined together to form American Hot LLC; (4) American Hot was one way in which Brown bribed Russo; and (5) Sutley, at the behest of Russo, talked with Brown about Brown's purchase of Davidson's two houses. We believe this evidence is sufficient for a reasonable juror to infer both that Sutley knew of Russo and Brown's illicit arrangement and that Sutley willingly joined this conspiracy by participating in American Hot.

*C. Wall's Honest Services Convictions*

convictions on the basis of his knowing participation in the bribery scheme, we need not address the merits of this argument.

16

The jury found Wall guilty of five substantive honest services counts (12-14, 17, 20) and one honest services conspiracy count (1). Post-trial, the district court set aside Wall's honest services conspiracy conviction. Wall appeals his convictions for the substantive counts, and the Government cross-appeals the district court's grant of Wall's post-judgment motion for judgment of acquittal on the conspiracy count. The argument raised by Wall is the same on both his conspiracy conviction and substantive convictions–that there was insufficient evidence that he knowingly participated in a scheme to bribe Russo.

The standard of review for a motion for judgment of acquittal based on sufficiency of the evidence is *de novo. United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002). This court views the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *Id.*

As previously stated, in order to be convicted of honest services conspiracy, the Government must show the existence of: (1) an agreement between two or more persons to achieve an unlawful objective; (2) a defendant's knowledge of and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy. *Suba*, 132 F.3d at 672. We conclude from the record that the Government met its burden in this case in establishing these

17

elements.

First, the record indicates that in the spring of 2005, Wall met with potential investors for the Water Club, a project Wall and Brown jointly undertook. At this meeting, Wall was asked about zoning issues, and he responded that Brown "had City Hall in pretty good shape" and that they "could guarantee the zoning." One of the potential investors testified that this was the first time in his 25 years in the business that someone had guaranteed zoning. Furthermore, there was also testimony that the Water Club project was controversial and zoning was going to be difficult to attain. This testimony is sufficient for a reasonable juror to infer that, as of the spring of 2005, Wall knew that Brown was bribing Russo.

Second, the record reveals that later in 2005, business partners of Wall, acting on the advice of Wall, purchased a piece of property from Russo, which he bought and sold on the very same day. This deal netted Russo $400,000. After this deal closed, Wall told Brown "to be sure the mayor knew who made the deal happen." Furthermore, the application for zoning for the Water Club was filed just ten days prior to the closing of this deal. In light of this evidence, a reasonable juror could conclude that Wall voluntarily joined the existing conspiracy between Brown and Russo when he arranged for the purchase of the Bankester lots.

Therefore, we conclude that the district court erred in granting Wall's motion for judgment of acquittal on the conspiracy count. Furthermore, for the same reasons, we affirm Wall's substantive honest services convictions. We do not address the Government's challenge to Wall's sentence because, in light of our reinstatement of the conspiracy conviction, Wall will need to be re-sentenced by the district court.[6]

*D. Obstruction Convictions*

Sutley and Russo argue that their conspiracy convictions are invalid because neither statute which the Government alleges they conspired to violate, 18 U.S.C. § 2232(a) and 18 U.S.C. § 1512(c)(2), apply to their conduct. We disagree.

Title 18 U.S.C. § 1512(c)(2) makes it a crime to "corruptly . . . obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." The indictment in this case sought criminal forfeiture of Russo and Sutley's ill-gotten gains. Since a criminal forfeiture is an "official proceeding," and concealment, destruction, or dissipation of specified forfeitable property "obstructs" or "impedes" the proceeding, we conclude that Sutley and Russo's attempt to hide the money they made from American Hot violates this statute.

---

[6] We also conclude that Wall's contention that the wire and mail transmissions were not material to the bribery scheme is without merit.

19

The Appellants argue that, even if their conduct was covered by 18 U.S.C. § 1512(c)(2), we still must reverse their convictions because their conduct was not covered by 18 U.S.C. § 2232(a), and since the jury returned a general verdict of guilty on the obstruction conspiracy count, "the verdict may be set aside if one of the conspiracy theories is contrary to law." *United States v. Pendergraft*, 297 F.3d 1198, 1210 (11th Cir. 2002). The legal theory cited by the Appellants originated in *Yates v. United States*[7] and remains good law. However, the *Yates* rule does not apply when "the jury necessarily made the findings required to support a conviction on the valid ground." *United States v. Holland*, 116 F.3d 1353, 1358 (10th Cir. 1997), *overruled on other grounds*, *Bousley v. United States*, 523 U.S. 614, 118 S. Ct. 1604 (1998). In this case, in order to convict the Appellants under either 18 U.S.C. § 2232(a) or 18 U.S.C. § 1512(c)(2), the jury had to make the same finding–that the Appellants agreed to transfer the funds for the purpose of preventing the Government from seizing them. Since this finding is sufficient to uphold a conviction under 18 U.S.C. § 1512(c)(2), we need not determine whether the Appellants' conduct is covered by 18 U.S.C. § 2232(a).[8]

---

[7] *Yates v. United States*, 354 U.S. 298, 312, 77 S. Ct. 1064 (1957), *overruled on other grounds*, *Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141 (1978).

[8] Russo also challenges his substantive obstruction conviction, which was under 18 U.S.C. § 1512(c)(2). As discussed above, Russo's transfer of the money, which he knew the Government sought via forfeiture, impeded an official proceeding and is thus covered by the statute. We therefore also affirm his substantive obstruction conviction.

*E. Criminal Forfeiture*

Russo contends that forfeiture was inappropriate in this case for two reasons. First, he points to the fact that the indictment erroneously sought forfeiture under 18 U.S.C. § 982, which only allows for criminal forfeiture for wire/mail fraud violations that affect a financial institution. The Government agrees that it was not entitled to criminal forfeiture in this case under 18 U.S.C. § 982. However, the Government argues that the reference to 18 U.S.C. § 982 in the indictment was a scrivener's error, and they were really seeking forfeiture under 18 U.S.C § 981 and 28 U.S.C. § 2461. We agree. Since the indictment clearly notified the Appellants that the Government sought to forfeit their fraud proceeds, the Appellants were not prejudiced by the scrivener's error, and absent prejudice, a scrivener's error in the indictment is not grounds for reversal. *See* Fed.R.Crim.P. 7(c)(3); *United States v. Edelkind*, 467 F.3d 791, 800 (1st Cir. 2006) (incorrect citation of 18 U.S.C. § 982 rather than § 981 was not prejudicial and did not warrant reversal).

Next, Russo argues that even if the reference to § 982 was a mere scrivener's error, the Government was still not entitled to forfeiture under 18 U.S.C. § 981 and 28 U.S.C. § 2461. We disagree. Title 18 U.S.C. § 981 permits civil forfeiture for offenses constituting "specified unlawful activity" under 18

U.S.C. § 1956(c)(7). Some of the offenses covered by 18 U.S.C. § 1956(c)(7) are the RICO predicate acts listed in 18 U.S.C. § 1961(1), which include mail and wire fraud. Furthermore, 28 U.S.C. § 2461 "authorizes criminal forfeiture for any criminal offense for which civil forfeiture is authorized" and for which "no specific statutory provision is made for criminal forfeiture upon conviction." Because civil forfeiture for mail/wire fraud is allowed under 18 U.S.C. § 981 and 28 U.S.C. § 2461 allows for criminal forfeiture when civil forfeiture is authorized, the Government argues that criminal forfeiture was appropriate in this case. Russo contends that 18 U.S.C. § 982 is a "specific statutory provision," which removes mail/wire fraud from the purview of 28 U.S.C. § 2461.

We disagree with Russo's interpretation of the interplay between 28 U.S.C. § 2461 and 18 U.S.C. § 981. Rather, we choose to adopt the reasoning of both the Third and D.C. Circuits–the only two circuits to address this issue. Both courts have reasoned that:

> To interpret the statute, we begin with its plain language. Ascribing plain meaning to the words of 28 U.S.C. Section 2461(c), criminal forfeiture is not permitted unless (1) a substantive provision exists for civil forfeiture of the criminal proceeds at issue; and (2) there is no specific statutory provision that permits criminal forfeiture of such proceeds. Thus, we read the statute, enacted eight years after Congress last amended 18 U.S.C. § 982(a)(2), as a "bridge" or "gap-filler" between civil and criminal forfeiture, in that it permits criminal forfeiture when no criminal forfeiture provision applies to the crime

22

charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized. Accordingly, under our reading, § 2461(c) permits criminal forfeiture for general mail fraud because (1) 18 U.S.C. § 981(a)(1)(C) authorizes civil forfeiture for general mail fraud; and (2) no statutory provision specifically authorizes criminal forfeiture for general mail fraud.

*United States v. Day,* 524 F.3d 1361, 1376 (D.C. Cir. 2008) (quoting *United States v. Vampire Nation*, 451 F.3d 189, 199 (3d Cir. 2006)).  Therefore, we conclude that the district court did not err in ordering the forfeiture of Russo's ill-gotten gains.[9]

## III. CONCLUSION

For the aforementioned reasons, we affirm Russo's conspiracy to commit honest services fraud conviction, the criminal forfeiture of his American Hot proceeds, his conspiracy to obstruct justice conviction, his obstruction of justice conviction, and all of his substantive honest services convictions, except those stemming from his personal use of campaign funds (Counts 22-25), which we vacate.  We affirm all of Sutley's and Wall's convictions and reinstate Wall's conspiracy conviction.

In light of our reinstatement of Wall's conspiracy conviction and vacatur of

---

[9] The Government cross-appeals the district court's denial of forfeiture for Sutley's proceeds from American Hot.  We see no error in the district court's reasoning and thus affirm the denial.

23

some of Russo's convictions, we remand their cases to the district court for re-sentencing.

**AFFIRMED in part; VACATED and REMANDED in part.**