**UNITED STATES of America, Plaintiff–Appellant, Cross–Appellee,**

v.

**Mary Sue COY; Joseph Reilly; Daniel Heaton, Defendants–Appellees, Cross–Appellants.**

**No. 92–2143.**

United States Court of Appeals, Eleventh Circuit.

April 27, 1994.

---

Sandra Mullgrav, Tampa, FL, for Coy.

Javier Guzman, Tampa, FL, for Reilly.

Robert H. Dillinger, St. Petersburg, FL, for Heaton.

Dennis Moore, Asst. U.S. Atty., Tamra Phipps, David P. Rhodes, Asst. U.S. Atty., Tampa, FL, for appellant/cross-appellee.

Before KRAVITCH and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

The defendants were convicted of various crimes involving the importation and distribution of marijuana. On appeal, the defendants challenge their convictions. The Government challenges the defendants' sentences, contending that the district court erred in failing to impose relevant mandatory minimum sentences. We affirm the convictions but vacate the sentences and remand for resentencing.

## I. Facts and Procedural History

This case involves the tale of two fishing vessels (the *Duke* and the *Dan's Plan*) and an unusual event in the Gulf of Mexico. In 1987, both vessels fished out of the docks of Dick's Seafood in Madeira Beach, Florida. The *Duke* was owned by Mary Sue Coy and captained by Raymond "Baby Ray" Koethe.[1] The *Dan's Plan* was owned by Daniel Heaton and captained by Joseph Reilly.

In late February 1987, the *Duke* departed the docks of Dick's Seafood for a three-week fishing excursion in the Gulf of Mexico. During the trip, the weather started getting rough as a storm approached, so the crew anchored the vessel at Fort Jefferson in the Dry Tortugas to ride out the storm. Four days later, the storm passed and the *Duke* and crew returned to the Gulf to continue fishing.

Around noon the same day, the *Duke* rendezvoused with the *Dan's Plan* for a fuel transfer approximately thirty miles north of Fort Jefferson and sixty miles west of the Florida coast. The crews knew each other and the *Duke* needed additional fuel to continue its trip. The *Dan's Plan* had departed Madeira Beach a day earlier for a similar fishing excursion in the Gulf. After the

---

1. Due to medical problems, Koethe was tried separately.

transfer, the vessels parted a short distance to continue their quest for grouper.[2]

Both vessels laid out their fishing lines shortly after the fuel transfer. A crew member on the *Dan's Plan* saw a small twin engine airplane flying low above the water and being pursued by a U.S. Customs airplane.[3] The planes were flying west and away from shore. About an hour later, both crews saw the small twin engine airplane returning east, flying just yards above the water. On board the *Duke*, a crew member heard Koethe radio "low flying duck" while a crew member on board the *Dan's Plan* heard Koethe radio "low flying bird."[4] The plane passed the *Dan's Plan* first and as it passed near the *Duke*, square bales started falling from its cargo doors into the waters of the Gulf below. The plane continued to dump the bales roughly in a line until it reached the horizon. The bales were tan and contained packages of marijuana.

Both crews ceased their fishing activity; Reilly on the *Dan's Plan* and Koethe on the *Duke* steered their vessels toward the line of bales. Both crews loaded several bales aboard their respective vessels but apparently without any coordination between the two crews. There were additional radio conversations between Koethe and Reilly after the drop, but none of the witnesses could testify as to what was said.

Shortly thereafter, both vessels headed for Dick's Seafood dock in Madeira Beach. The *Dan's Plan* arrived early the next morning before the *Duke*. Upon arrival, Reilly phoned Terry Dinninger, an acquaintance, to request his assistance in selling the marijuana. Dinninger in turn called John Albee. Soon thereafter a van arrived at the dock. The marijuana was then transferred from the vessel to the van. The van was owned by John Albee and the marijuana was taken to his house.

At Albee's house, the marijuana was dried, rewrapped, and packaged. The marijuana remained at Albee's house for nearly a week. During this time, Reilly and Heaton met with Dinninger to arrange for the distribution of the marijuana. The three agreed the marijuana would be sold to an acquaintance of Dinninger's in Michigan. It was also agreed each crew member and Albee would receive $10,000.00 for their participation in the venture.

The *Duke* arrived at Dick's Seafood dock later on the same day the *Dan's Plan* had arrived. Coy drove her Jeep to the dock and met the vessel upon its arrival. The *Duke*'s crew loaded the marijuana into Coy's Jeep. Coy, along with Koethe and *Duke* crew members, then drove it to a home shared by Coy and Koethe. Within the week, Koethe paid at least two of his crew members $10,000.00 for their assistance with the marijuana.

Sometime thereafter, Wade Tappan arranged a purchase of some of the marijuana from Koethe. A local fisherman named Robert Lacius met Tappan and delivered the marijuana to Tappan. Tappan then called Koethe to arrange payment for the marijuana. The next day, Coy went to Dick's Seafood where Tappan worked. Tappan and Coy drove in separate vehicles to a place several blocks from Dick's Seafood where Tappan placed a knapsack containing $14,000.00 into Coy's vehicle as payment for the marijuana.

On September 12, 1991, a federal grand jury in Tampa, Florida, returned a four-count indictment against Heaton, Reilly, Koethe, and Coy. Count one charged conspiracy to import marijuana in violation of 21 U.S.C. § 963 (1988), and count two charged importation of marijuana in violation of 21 U.S.C. § 952 (1988). Count three charged conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846 (1988), and count four charged possession with intent to distribute marijuana in viola-

---

**2.** Grouper is a delicious fish indigenous to the waters of the Gulf of Mexico.

**3.** This was also witnessed by Larry Gardner, a Government witness who was fishing on a vessel within radio distance of the *Duke* and the *Dan's Plan.* (R.7 at 117).

**4.** Gardner testified to hearing Koethe say "low flying duck" also. (R.7 at 107). Gardner also testified that shortly thereafter, he heard someone say "it [is] raining square grouper" but could not identify the voice. (Id.). "Square grouper" is a slang term in the fishing business that means floating bales of marijuana. (R.7 at 134).

tion of 21 U.S.C. § 841(a) (1988). None of the counts alleged the quantity of marijuana involved. The indictment also sought forfeiture of the two vessels and the home owned by Coy.

The case proceeded to trial. At the close of the Government's evidence, the court granted Heaton's motion for judgment of acquittal on counts one and two. On December 10, 1992, the jury returned guilty verdicts against Heaton on counts three and four, against Reilly on all counts, and against Coy on counts three and four. The jury subsequently returned a special verdict finding that the two vessels and Coy's house were subject to forfeiture.

At the sentencing hearing, the court heard arguments concerning the propriety of imposing mandatory minimum sentences based on the quantity of marijuana involved. The court found that the amount of marijuana involved in the conspiracy [5] exceeded 1000 kilograms, but determined that the mandatory minimum provisions could not be applied to the defendants because of the Government's failure to provide the defendants with sufficient pre-trial notice of its intent to seek such penalties. (R. 11 at 20). Subsequently the court sentenced Coy to forty-two months imprisonment on counts three and four, to run concurrently, and to a special parole term of two years on count four. The court sentenced Heaton to terms of five years imprisonment on counts three and four, to run concurrently, and a special parole term of two years on count four. The court sentenced Reilly to terms of imprisonment of five years on counts one and two, to run concurrently, and five years as to counts three and four, to run concurrently with each other but consecutive with the sentences imposed on counts one and two. The court also imposed a special parole term of five years on counts three and four.

## II. Issues on Appeal & Contentions of the Parties

All three defendants contend that there was a prejudicial variance between the indictment, which charged a single conspiracy, and the proof at trial, which they contend established separate conspiracies. In addition, Coy argues that the court violated her due process rights by giving a coercion instruction to the jury when coercion was not a theory of defense she relied upon. Coy also contends that the court erred in failing to sever her trial based on her need for exculpatory testimony from co-defendant Koethe. Heaton and Coy argue that the court erred in rejecting a *Batson* challenge to the Government's peremptory strike of a black juror and in denying a motion for a bill of particulars.[6] Heaton also contends that the court erred in restricting the cross-examination of a Government witness and in ordering forfeiture of the *Dan's Plan*.[7] In response, the Government maintains that all convictions should be affirmed.

Additionally, the Government contends that the district court imposed an illegally short custody sentence when it found that over 1000 kilograms of marijuana were involved in the conspiracy, but refused to impose mandatory minimum ten year sentences pursuant to 21 U.S.C. §§ 841(b)(1)(A)(vii) & 960(b)(1)(G). The defendants counter that the court correctly refused to impose the mandatory minimum penalty provisions because the Government failed to provide adequate notice to the defendants of its intent to seek penalties under these provisions.

## III. Discussion

### A. Variance

The defendants argue that the indictment erroneously charged them with a single con-

---

5. The court also noted that the jury had made a determination that a single conspiracy existed and therefore the total amount of marijuana involved would be attributable to each of the co-conspirators. (R.11 at 21–22).

6. After oral argument in this case, Coy filed a motion, which we subsequently granted, wherein she adopts Heaton's *Batson* argument, his bill of

particulars argument, and his variance argument.

7. We note that Reilly's reply brief, for the first time, attempts to raise the improper restriction of cross-examination argument. Arguments raised for the first time in a reply brief are not properly before a reviewing court. *United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir.1984).

spiracy and that the proof at trial revealed multiple conspiracies. Accordingly, they contend that no reasonable jury could have found that a single conspiracy existed. Because of this variance between the indictment and the proof at trial, the defendants argue, this court must vacate their conspiracy convictions.

As the defendants paint the picture, the airplane drop in the Gulf was a wholly unexpected and unplanned event. When the crews saw the drop, they *separately* picked the bales up, *separately* returned to Madeira Beach, and, ultimately, *separately* distributed their booty. Thus, the implication is that two conspiracies actually existed; one among the defendants associated with the *Dan's Plan* and one among the defendants associated with the *Duke*.

We will not reverse convictions based on a variance unless the variance was (1) material and (2) substantially prejudiced the defendants. *United States v. Reed,* 980 F.2d 1568, 1581 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993) (quoting *United States v. Church,* 955 F.2d 688, 697 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992)). On review of whether a material and prejudicial variance occurred between the indictment and the proof, we employ a two step inquiry. First, viewing the evidence in the light most favorable to the Government, we inquire whether a reasonable jury could have determined beyond a reasonable doubt that a single conspiracy existed. *Id.;* *United States v. Caporale,* 806 F.2d 1487, 1500 (11th Cir.1986), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). Second, we determine whether any substantial prejudice resulted to the defendants if more than one conspiracy did in fact exist. *Church,* 955 F.2d at 697; *United States v. Warren,* 772 F.2d 827, 835 n. 12 (11th Cir. 1985).

We conclude that no reasonable jury could have determined beyond a reasonable doubt that there was a single conspiracy. The

evidence suggests two similar but separate conspiracies. However, we also conclude that no substantial prejudice resulted from the variance.

### 1. Single vs. Multiple Conspiracies

In determining whether the jury could have found a single conspiracy, we consider the following factors: " '(1) whether a common goal existed, (2) the nature of the scheme underlying the crimes charged, and (3) the overlap of participants.' " *United States v. Adams,* 1 F.3d 1566, 1584 (11th Cir.1993) (quoting *Reed,* 980 F.2d at 1582); *United States v. Jones,* 913 F.2d 1552, 1561 (11th Cir.1990); *Caporale,* 806 F.2d at 1500.

After thoroughly reviewing the record, we conclude that a reasonable jury could not have determined beyond a reasonable doubt that a single conspiracy existed. There is simply an absence of evidence that the two vessels' crews and owners coordinated the importation and subsequent distribution of the marijuana in question. The evidence suggests that two separate conspiracies in fact existed; one involving the crew of the *Duke,* Koethe, and Coy, and another involving the crew of the *Dan's Plan,* Reilly, and Heaton. Application of the required three factors test strengthens our conclusion.

First, it is clear that all those involved shared a common goal to import and/or distribute this marijuana.[8] We emphasize that "common" for the purposes of this test means "similar" or "substantially the same" rather than "shared" or "coordinate."[9] *See Adams,* 1 F.3d at 1584 ("common goal" inquiry satisfied by the common crime of conspirators: importation of marijuana); *U.S. v. LaSpesa,* 956 F.2d 1027, 1031 (11th Cir.1992) (same: fraud); *Jones,* 913 F.2d at 1561 (11th Cir.1990) (same: distribution of cocaine); *United States v. Khoury,* 901 F.2d 948, 956 (11th Cir.1990) (same: importation of methaqualone).

Second, although the importation schemes

---

8. By this statement, we do not suggest that the acquittal of Coy and Heaton on the importation charges was incorrect.

9. If "common" took on this later meaning, there would be little need for further analysis.

were similar,[10] the distribution schemes were distinct. Once the crews brought the marijuana to shore, the two schemes became completely dissimilar. Separate vehicles, manned by separate personnel took the marijuana to separate locations. In turn, Heaton and Reilly sold their marijuana to a purchaser in Michigan while Coy and Koethe sold their marijuana to local customers.

Finally, there was no overlap of participants in the two separate conspiracies. The testimony at trial indicated that the two crews did not assist each other when picking up the marijuana from the water. (R. 6 at 90–92; R. 6 at 202–03; R.5 at 165–68). The only specific evidence at trial of communication between the vessels was a radio transmission of Koethe saying either "low flying bird" or "low flying duck." (R.6 at 89; R.6 at 199–200). The only evidence of common assistance is the testimony of Curtis Joe Johnson, a member of the *Duke's* crew, that Jarrat Lungren, from the crew of the *Dan's Plan*, assisted the *Duke's* crew in offloading their marijuana. (R.6–101).

Johnson's testimony of common assistance, which we are bound to credit, is simply insufficient to establish the existence of a single conspiracy in this case. *See United States v. Harrison*, 942 F.2d 751, 756–57 (10th Cir. 1991) (when interdependence among alleged coconspirators cannot be shown, the existence of separate conspiracies must be recognized). The crews of the *Dan's Plan* and the *Duke* separately imported this marijuana; both in violation of 21 U.S.C. § 960. Subsequently, the captain and owner of the *Dan's Plan* (Reilly and Heaton) and the captain and owner of the *Duke* (Koethe and Coy), separately distributed the marijuana; all in violation of 21 U.S.C. § 841.

### 2. Substantial Prejudice

■ The finding that two conspiracies existed does not end the analysis. We next inquire whether this variance prejudiced the defendants' substantial rights. *United States v. Reed*, 980 F.2d 1568, 1583 (11th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993). Such prejudice occurs when "(1) the proof at trial differs so greatly from the charges in the indictment that the defendant is unfairly surprised and has an inadequate opportunity to prepare a defense, or (2) if there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury transferred evidence from one conspiracy to a defendant involved in another conspiracy." *Id.*, (citing *Caporale*, 806 F.2d at 1500; *United States v. Warren*, 772 F.2d 827, 835 n. 12 (11th Cir. 1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986); *United States v. Hall*, 632 F.2d 500, 504 (5th Cir.1980)[11]); *United States v. Jones*, 913 F.2d 1552, 1561 (11th Cir.1990).

Despite the defendants' detailed arguments concerning the existence of multiple conspiracies rather than a single conspiracy, they fail to articulate what prejudice they suffered as a result. After reviewing the record, we conclude that the defendants' substantial rights were not prejudiced by this variance.

First, the defendants were not "unfairly surprised" at trial so as to be prevented from preparing an adequate defense. The crimes the indictment charged and the crimes the separate conspirators committed were identical. Had the indictment charged separate conspiracies, rather than a single conspiracy, it is unlikely the defenses would have varied in any material manner. *See Jones*, 913 F.2d at 1562 (no unfair surprise because variance "did not alter the crime charged, the requisite elements of proof or the appropriate defenses in any significant manner."). More importantly, the defendants do not argue on

---

**10.** The actions of the vessels were not identical after the crews retrieved the bales from the Gulf. Testimony at trial revealed that after loading the marijuana, the *Duke's* crew continued to fish for some time before heading for Madeira Beach. (R.6 at 59). The *Dan's Plan*, on the other hand, headed directly for Madeira Beach after loading the marijuana. (R.6 at 205).

**11.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

appeal that surprise prejudiced their defenses.

Second, the defendants have not been prejudiced by any improper transfers of evidence between them. This case does not present a complicated factual scenario with multiple defendants and conspiracies that might lead to significant jury confusion in applying the evidence. *See Reed,* 980 F.2d at 1583. At most only two conspiracies existed. This is a much simpler case than *Caporale,* which involved eleven defendants in a complicated labor union/insurance fraud conspiracy. Even on the complex facts of *Caporale,* we held that there was no risk of significant jury confusion. 806 F.2d at 1501. Additionally, the verdicts in this case demonstrate the jury's ability to sift through the evidence and treat each defendant separately. Only Reilly, who was active in *both* the importation and distribution, was convicted on all charges. Such individual treatment of the defendants by the jury demonstrates the absence of confusion and improper transfers of evidence. *See Reed,* 980 F.2d at 1583; *United States v. LeQuire,* 943 F.2d 1554, 1561 (11th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992); *Caporale,* 806 F.2d at 1501; *United States v. Rodriguez,* 765 F.2d 1546, 1553 (11th Cir. 1985). Thus, the conspiracy convictions are due to be affirmed.

### B. Coy's & Heaton's Other Alleged Errors

We have considered the additional issues presented by Coy and Heaton and conclude that they are without merit and do not warrant further discussion. *See* 11th Cir. Rule 36–1.

### C. Government's Petition for Mandamus for Correction of Sentences

█ The Government initially challenged the sentences in this case by appeal, alleging that this court had jurisdiction under 18 U.S.C. § 3742(b)(1) (1988) and 28 U.S.C. § 1291 (1988). After inquiry from the bench and further briefing, the Government conceded that these statutes do not provide this

court with jurisdiction over its attempted appeal. Section 3742(b)(1) confers appellate jurisdiction over Government appeals "if the sentence was in violation of law." 18 U.S.C. § 3742(b)(1) (1988). However, section 3742 applies only to offenses committed after its effective date of November 1, 1987. *Sentencing Act of 1987,* Pub.L. No. 100–182, § 2, 101 Stat. 1266 (1987); *United States v. Martinez–Zayas,* 857 F.2d 122, 127 (3d Cir.1988). As the subject offenses occurred before the effective date, the statute does not confer jurisdiction in this case.[12]

The Government has asked that we treat its ineffective appeal in this case as a petition for mandamus relief. We may treat an ineffective appeal as a petition for a writ of mandamus pursuant to 28 U.S.C. § 1651(a) (1988) in appropriate cases. *See, e.g., Dobard v. Johnson,* 749 F.2d 1503, 1508 (11th Cir.1985) (attempted appeal treated as a petition for writ of mandamus); *Hines v. D'Artois,* 531 F.2d 726, 732 (5th Cir.1976) ("we ... have the discretionary authority to treat [an] attempted appeal as a petition for mandamus"). As we explained in *Hines,*

> Mandamus ... is an extraordinary remedy reserved for extraordinary situations ... but the limited availability of the writ does not preclude our examination of an attempted appeal to determine whether the action appealed from reflected the sort of abuse of discretion which would render the writ appropriate.

531 F.2d at 732 (citations omitted).

█ In order to be entitled to a writ of mandamus, a party must demonstrate that no other remedy is available and that it has a "clear and indisputable" right to the writ's issuance. *In re Capital Cities/ABC, Inc.,* 918 F.2d 140, 144 (11th Cir.1990); *United States v. Noriega,* 917 F.2d 1543, 1546 n. 3 (11th Cir.), *cert. denied,* 498 U.S. 976, 111 S.Ct. 451, 112 L.Ed.2d 432 (1990). Prior to the enactment of 28 U.S.C. § 1651(a), mandamus was the only remedy available to the prosecution for correction of an illegal sentence. *See United States v. Cannon,* 778 F.2d 747,

---

**12.** Apparently the Government also concedes that 28 U.S.C. § 1291 is similarly unavailing as jurisdiction for its appeal.

748 (11th Cir.1985); *United States v. Dean,* 752 F.2d 535, 545 (11th Cir.1985), *cert. denied,* 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986); *United States v. Denson,* 603 F.2d 1143, 1147 (5th Cir.1979) (en banc).

The Government argues that the sentences in this case were illegally short because the district court refused to impose the mandatory minimum provisions of 21 U.S.C. §§ 841(b)(1)(A)(vii) & 960(b)(1)(G) after finding that more than 1000 kilograms of marijuana were involved in the conspiracy. We review the propriety of a district court's application and interpretation of federal statutes *de novo. See United States v. Huppert,* 917 F.2d 507, 510 (11th Cir.1990).

The language of 21 U.S.C. §§ 841(b)(1)(A)(vii) & 960(b)(1)(G) clearly provides that any person convicted of distributing or importing more than 1000 kilograms of marijuana shall be subject to a mandatory minimum sentence of ten years imprisonment. The district court found that more than 1000 kilograms were involved in the offenses (R. 11 at 22) but concluded that mandatory minimum sentences should not be imposed because the Government had failed to give the defendants pre-trial notice of its intent to seek such penalties. (R. 11 at 20). The court reached this conclusion based on its belief in the continued viability of *United States v. Alvarez,* 735 F.2d 461 (11th Cir. 1984).

In *Alvarez,* we held that for purposes of the enhanced sentencing provisions of 21 U.S.C. § 841(b)(1) (1982), the quantity of marijuana involved was a critical element of the offense. 735 F.2d at 467–68. Because the indictment had failed to allege a specific quantity of marijuana, we vacated the defendants' enhanced sentences. *Id.* Following *Alvarez,* we have held that quantity is *not* an element of an offense under § 841(b)(1) and is an issue relevant only to sentencing. *United States v. Cross,* 916 F.2d 622, 623 (11th Cir.1990), *cert. denied,* 499 U.S. 929, 111 S.Ct. 1331, 113 L.Ed.2d 263 (1991); *United States v. Williams,* 876 F.2d 1521 (11th Cir.1989); *United States v. Smith,* 840 F.2d 886, 888 (11th Cir.) *cert. denied,* 488 U.S. 859, 109 S.Ct. 154, 102 L.Ed.2d 125 (1988).

*Alvarez*'s apparent conflict with *Cross, Williams,* and *Smith* was explained in our recent decision in *United States v. Perez,* 960 F.2d 1569, 1574–75 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1421, 122 L.Ed.2d 790 (1993). In *Perez,* we explained that the Supreme Court's decision in *McMillan v. Pennsylvania,* 477 U.S. 79, 84, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986), precipitated the *Cross* court's departure from *Alvarez. Id. McMillan* held that the prosecution is only required to prove beyond a reasonable doubt "all of the elements included in the definition of the offense of which the defendant is charged." *Cross,* 916 F.2d at 623 (quoting *McMillan,* 477 U.S. at 85, 106 S.Ct. at 2327). The *Cross* court reasoned that § 841(a) defined the offense which the Government was required to prove, but that § 841(b) operated as a sentencing provision and only became applicable after a violation of § 841(a) had been proven. *Cross,* 916 F.2d at 623. Since *Cross,* it is clear that in this circuit the Government need not prove quantity at trial, *United States v. Adams,* 1 F.3d 1566, 1582 (11th Cir.1993); *United States v. Andrews,* 953 F.2d 1312, 1318 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 3007, 120 L.Ed.2d 882 (1992); *United States v. Van Hemelryck,* 945 F.2d 1493, 1503 (11th Cir.1991); *Cross,* 916 F.2d at 623, nor allege a specific quantity in an indictment, *United States v. Milton,* 979 F.2d 839, 840 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 824, 121 L.Ed.2d 695 (1992); *Perez,* 960 F.2d at 1574–75, in order to subject defendants to enhanced sentences based on quantity under § 841(b)(1). The same conclusions apply to prosecutions for importation offenses in violation of § 960(a) which involve enhanced penalties based on quantity under § 960(b). *Adams,* 1 F.3d at 1582. Thus, it is clear that the *Alvarez* rule is no longer the law of this circuit. *See Perez,* 960 F.2d at 1574; *United States v. Olness,* 9 F.3d 716, 717 (8th Cir. 1993) (citing *Perez* for the proposition that *Alvarez* is no longer followed in our circuit).

The district court recognized *Alvarez*'s apparent conflict with *Cross,* but reasoned that *Alvarez* still had some continuing viability. (R. 11 at 20). Based on this belief, the court held that the defendants were entitled to pre-

trial notice of the Government's intent to seek mandatory minimum sentences under § 841(b)(1)(B). We conclude that the court erred in this determination and that the Government is entitled to mandamus relief.

As previously discussed, the quantity of drugs involved in a defendant's prosecution under § 841 or § 960 is not an element of the offense that need be pled or proven at trial, but an issue for the court to determine at the sentencing phase. *See, e.g., Perez,* 960 F.2d at 1574–75. Therefore, due process requires only that a defendant be given pre-sentencing notice, not pre-trial notice, of potential sentences based on quantity under § 841 or § 960. *See id.* at 1575.

In *Perez,* the court found "the Government's responses to the standing discovery order adequately put the defendants on notice of the quantity ... allegedly involved." *Id.* at 1474–75. In this case, the pre-sentence investigation reports on each of the defendants indicated that "approximately 3000 pounds of marijuana" (well over 1000 kilograms) was involved.[13] (Defs. Present. Rep. at 3). Therefore, the defendants had notice of the quantity involved; this necessarily gave them notice that, under 21 U.S.C. §§ 841(b)(1)(A)(vii) & 960(b)(1)(G), they faced ten year mandatory minimum sentences if quantity was proven at sentencing. The defendants were not entitled to further notice of the Government's "intent" to seek ten year mandatory minimum sentences because under 21 U.S.C. §§ 841(b)(1)(A)(vii) & 960(b)(1)(G) this was the sentence the district court was *required* to impose if the alleged quantity was proven at sentencing. As explained in *Perez,* if quantity is established by a preponderance of the evidence at sentencing and all due process requirements are met, "courts are constrained to apply the

sentencing framework established by statute." 960 F.2d at 1575.

Hence, the Government is entitled to mandamus relief as the sentences imposed were illegal under §§ 841(b)(1)(A)(vii) & 960(b)(1)(G) based on the court's determination of quantity. *See United States v. Huss,* 520 F.2d 598, 602 (2d Cir.1975) ("[I]llegal sentence ... is one ... contrary to applicable statute."); *see also United States v. Story,* 891 F.2d 988, 991 (2d Cir.1989) (defining "illegal sentence" as one imposed contrary to U.S. Sentencing Guidelines). The defendants' sentences are vacated and this case is remanded to the district court for resentencing.

Having found that two separate conspiracies existed, we necessarily conclude that the district court erred in attributing the total amount of marijuana involved in both conspiracies to each of the defendants. At resentencing the district court should determine the amount of marijuana attributable to each of the defendants in light of this opinion. Should the amount exceed 100 kilograms, a five year mandatory minimum sentence will be applicable. 21 U.S.C. §§ 841(b)(1)(B)(vii) & 960(b)(2)(G). Should the amount exceed 1000 kilograms, a ten year mandatory minimum sentence will be applicable. 21 U.S.C. §§ 841(b)(1)(A)(vii) & 960(b)(1)(G).

### IV. Conclusion

We affirm the defendants' convictions and grant the Government's petition for mandamus. Accordingly, we vacate the defendants' sentences and remand to the district court for resentencing consistent with this opinion. The mandatory minimum sentence provisions of 21 U.S.C. §§ 841(b)(1) & 960(b) will be applicable if the court determines that a de-

---

13. Additionally, a review of the trial transcript reveals that the defendants' counsels all had notice of the ten year mandatory minimum sentences. Throughout the trial, defense counsels questioned Government witnesses on their knowledge of the ten year mandatory minimum penalty each defendant faced. (R.6 at 54; R.6 at 153; R.8 at 143)

Perhaps the most telling statement is that of Coy's counsel, when she attempted to argue to the court at the close of the Government's case

that weight was an issue the Government had to prove at trial. The following excerpt, concerning a statement made at a pre-trial bail hearing, indicates that the defendants had notice of the weight and the mandatory minimum sentences:

MS JAMES: He [Government's attorney] stood before the magistrate and told the magistrate that this is *a minimum mandatory case,* your honor, because it involves over *3,000 pounds of marijuana.*

(R.8 at 178) (emphasis added).

fendant is chargeable with an amount of marijuana that triggers these provisions.

AFFIRMED IN PART; PETITION FOR MANDAMUS GRANTED; VACATED IN PART AND REMANDED.