[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14608
Non-Argument Calendar
_____

D.C. Docket No. 4:16-cv-00637-MW-CAS

ROBERT G. RAYMOND,

Plaintiff-Appellant,

versus

SOCIAL SECURITY ADMINISTRATION, COMMISSIONER,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(July 9, 2019)

Before WILLIAM PRYOR, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Robert Glenn Raymond appeals the district court's order affirming the final decision of the Social Security Commissioner, who denied Raymond's application for a period of disability and disability insurance benefits, 42 U.S.C. § 405(g). Raymond argues substantial evidence does not support the decision of the administrative law judge ("ALJ"). He raises three issues: (1) whether the ALJ properly weighed the opinion of Dr. Jeffrey B. English, Raymond's treating physician; (2) whether the ALJ properly determined Raymond's residual functional capacity; and (3) whether the ALJ erred in its credibility findings. We agree with the district court that substantial evidence supports the ALJ's decision in all respects. Therefore, we affirm.

## I. BACKGROUND

Raymond was born on May 10, 1968. He completed two years of college and, from January 1994–October 2009, worked in real estate as a loan officer and managing broker.

In July 2013, Raymond applied for a period of disability and disability insurance benefits, alleging disability beginning on October 31, 2009—his last day of long-term, full-time work.[1] In his application, he said he had multiple sclerosis ("MS"), bipolar/panic disorder, depression/anxiety, schizophrenia, low

---

[1] Raymond says he worked for four months in 2011 but was unable to continue due to his health problems.

2

testosterone, and insomnia.  After the Commissioner denied his claim and his

motion for reconsideration, Raymond requested a hearing before an ALJ.

Because this appeal hinges on whether substantial evidence supports the

ALJ's decision, it is necessary to take a detailed look at Raymond's medical

history.  We recount the relevant portions of the record to which both parties have

directed us.[2]  Although not all these facts will be presented in our analysis, we

include them for the reader to understand the record before the ALJ and how the

ALJ reached her decision.

## 1. Raymond's Medical History

Raymond's various symptoms began at some point in 2008.  He saw Dr.

Peter Futrell, who referred him for magnetic resonance imaging ("MRI") of his

brain.  The February 2009 MRI showed "volume loss and numerous white matter

hyperintensities," and the results were "suggestive of a demyelinating disease."

When Raymond returned to Dr. Futrell in March 2009 to discuss the MRI, he

complained of new problems with coordination and unsteadiness.  Nevertheless, a

physical examination revealed that Raymond was alert, that his speech was clear,

---

[2] Raymond points to certain evidence that was not presented to the ALJ, including medical source statements that post-date the ALJ's decision.  Although he presented that evidence to the administrative Appeals Council, he bases this lawsuit and appeal only on the ALJ's alleged evidentiary errors.  We thus decline to consider evidence not before the ALJ.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1266 (11th Cir. 2007) ("[W]hen a claimant challenges the administrative law judge's decision to deny benefits, but not the decision of the Appeals Council to deny review of the administrative law judge, we need not consider evidence submitted to the Appeals Council.").

and that he had a steady gait.  Dr. Futrell opined Raymond possibly suffered from MS and arranged for further testing.  A September 2009 MRI showed the brain appearance was stable when compared to prior the MRI.

In June 2010, after he had stopped working, Raymond saw Dr. Jeffrey English, a neurologist at the MS Center of Atlanta who oversaw Raymond's treatment protocol and whose opinions are at issue in this appeal.  Raymond complained of frequent urination and memory issues.  Dr. English noted that Raymond had previously been diagnosed with bipolar disorder.  He further opined that, at that point, Raymond likely had had MS for over ten years.  He ordered more tests, including another brain MRI and a cervical spine MRI.

Dr. English observed that Raymond had no physical symptoms except decreased sensation in certain areas and a mild sway when walking.  Similarly, a July 2010 annual physical examination by Dr. Robert Hudec (Raymond's family physician) revealed that Raymond's physical state was entirely normal, save for an obese abdomen.  This finding was consistent with Dr. Futrell's March 2009 physical examination.  So too with an August 2010 evaluation by Dr. Steve Shindell, a neuropsychologist to whom Dr. English had referred Raymond.  Dr. Shindell noted that Raymond "ambulated into the assessment room with a normal gait" and that his "[t]hought content was normal."

4

The results of Dr. Shindell's "neuropsychological assessment [were] consistent with moderate changes due to MS." Raymond's scores on various tests, including attention and concentration and memory, were as low as the ninth percentile. But Dr. Shindell noted concerns "about the possible impact of inconsistent responding and over-reporting." Dr. Shindell appears to have been more troubled by Raymond's apparent depression, noting Raymond reported "a significant lack of positive emotional experiences, pronounced anhedonia, and marked lack of interest." He diagnosed Raymond with "[m]oderate cognitive change secondary to MS" and depression. He also opined that Raymond's problems would clearly "be vocationally limiting."

In September 2010, Raymond received the MRI of his brain and his cervical spine that Dr. English had requested. Dr. English's report indicates Raymond felt "about the same" as in his previous visit. He noted the brain scans were unchanged, and the cervical spine scan showed some abnormalities. Dr. English did not perform a physical exam and did not indicate any change in treatment. He also opined "pursuing disability is reasonable given [Raymond's] job and abnormal neuropsychological testing."

Raymond had another physical examination with Dr. Hudec in January 2011. Once again, the only noteworthy finding was an obese abdomen. This time

5

Dr. Hudec did a neurological exam.  The results of that exam were also normal, except for "moderately impaired remote memory."

In March 2011, as part of the state disability-evaluation process, Raymond saw Dr. Norman Lee.  Dr. Lee's notes state that Raymond was punctual and "appeared to ambulate appropriately."  He seemed mildly depressed, but he also had fair judgment and adequate memory.  Dr. Lee opined that although Raymond's "observed cognitive abilities on the current testing generally fell in the low average to average range, his current abilities may be a slight reduction compared to his premorbid cognitive functioning."  Dr. Lee concluded that Raymond's "ability to understand, remember, and carry out basic directions is likely satisfactory, although he may be slightly more limited with more complex directions given his observed mood difficulties."  Dr. Lee diagnosed Raymond as bipolar and noted that he might be more limited during episodic periods of MS symptoms or with his mood difficulties.

That same month, Raymond again saw Dr. English.  He complained of worsening mobility and falls, with his legs suddenly giving out.  Dr. English's physical examination revealed spastic muscle tone in the lower extremities and hyper-reflexivity in the elbows and knees, but the other findings, including muscle strength in all muscle groups, were normal.  Raymond's report of falls prompted Dr. English to consider new medication, although he first wanted additional lab

6

tests from an internist.  When Raymond saw Dr. English again in June 2011, Raymond had not seen the internist, despite telling Dr. English he felt he was slowly getting worse.  Dr. English expressed doubt, given his lack of information, that Raymond's condition warranted the new medication.  Raymond also did not "feel bad enough" for the new treatment.  The June physical examination was virtually the same as it had been in March.  A July 2011 physical examination with Dr. Hudec, at which Raymond reported his insomnia was improving, was completely normal.

By February 2012, Raymond reported to Dr. English that his insomnia was instead worsening and that he was still experiencing a "steady decline."  Dr. English also wrote, "It's hard to know if [Raymond] is having true progression.  The symptoms are about the same."  An MRI the same day showed a lesion that was "not well identified on [the] previous study."  Overall, however, there was no change from the previous MRI.

In March 2012, Raymond again visited Dr. Hudec.  The physical exam was entirely normal.  Aside from anxiety and compulsive thoughts, the psychiatric evaluation was also normal.  A January 2013 visit to Dr. Hudec yielded an almost identical report.

In June 2013, Raymond visited Dr. English and reported a worsening of symptoms, including difficulty with speech, memory, multitasking, and working.

7

Dr. English's physical exam revealed a muscle-strength level of 4/5 (compared to his previous evaluations of 5/5), hyper-reflexivity in the elbows and knees, impaired finger-to-nose coordination, and a broad-based gait. Dr. English noted that Raymond did appear to be getting worse, opining that Raymond "ought to pursue disability again." Nevertheless, the MRI taken the next day showed the disease was stable.

Soon after, Raymond filed his disability claim. In August 2013, Dr. Galina Kats-Kagan, an internist, examined Raymond for state disability-benefits purposes. The thorough exam revealed no issues. Raymond's gait was normal; he had full mobility and motor functions; his grip strength and fine manipulation were normal; he could walk on his heel and toes without difficulty; he was able to balance on one leg; and he could change positions easily. Dr. Kats-Kagan also noted no psychological symptoms, including no anxiety or depression, and found Raymond's memory was intact and that his attention span and concentration were normal.

Raymond saw Dr. Hudec in April, August, and November of 2014. The results of physical examinations conducted at each of those visits were unremarkable. Regarding Raymond's mental function, however, Dr. Hudec noted that, during the November 2014 examination, Raymond's memory was notably worse.

8

Raymond also saw Dr. English in August and November of 2014. Both times Raymond reported a worsening of his condition, especially his memory. The physical examination results were the same as they had been in the past. Dr. English noted in November that the MRIs did not reveal a clear progression of the MS.[3] Still, Dr. English felt Raymond was "not doing well at this point" and thought it was worth changing his medication (although it is unclear whether he did). November 2014 follow-up MRIs of the brain and cervical spine showed no significant changes from the June 2013 MRIs.

Finally, in February 2015, Raymond again saw Dr. Shindell, who had performed the neuropsychological evaluation back in August 2010. Dr. Shindell concluded the "[r]esults of the neuropsychological assessment are consistent with moderate changes due to MS, with no significant decline since 2010." Dr. Shindell still believed the problems were "vocationally limiting." That same month, Dr. English went further, opining that Raymond would not "be able to go back to work in any reasonable capacity."

## 2. Additional Evidence Before the ALJ

---

[3] Dr. English's notes said, "MRI brain same. C spine wiht [*sic*] multifocal change. Can't tell a clear difference." It is unclear which MRI was the comparator.

In addition to Raymond's medical records, the ALJ also received a questionnaire from Dr. English and heard testimony from Raymond and a vocational expert.

Dr. English completed a Multiple Sclerosis Residual Functional Capacity Questionnaire on Raymond's behalf.  In the questionnaire, Dr. English indicated that Raymond suffered from fatigue, balance problems, poor coordination, weakness, unstable walking, difficulty remembering, depression, emotional lability, bladder problems, and sensitivity to heat.  He said Raymond had 4/5 muscle strength and "significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination."  He believed Raymond's experience of pain, fatigue, or other symptoms was severe enough to interfere constantly with his attention and concentration.  He also stated Raymond had a marked limitation in ability to deal with work-related stress.  With respect to specific functional limitations, Dr. English opined that Raymond could walk about one city block without rest; sit more than two hours; and stand for 30 to 45 minutes.  He said Raymond would need four or five breaks of 10 to 15-minutes in an eight-hour work day.  Raymond could frequently lift items under 10 pounds but only occasionally lift 10-pound items (and never items heavier than that).  Raymond would have significant limitations in doing repetitive reaching, handling, or fingering.  Dr. English also

10

advised that Raymond should avoid all exposure to extreme temperatures and high humidity. He was likely to have "good days" and "bad days," so he would likely need to be absent from work more than three times per month.

At the November 18, 2015, hearing, Raymond testified before the ALJ that he has extremely limited use of his left arm and has lost feeling in it. He can drive within a 20-mile radius to take his son to school and run errands. He would sometimes drive himself to Atlanta to see his doctors, but he would get "worn down" from the long drive, stopping at his mother's home to rest for the night. Every day, he would walk roughly 300 steps with his dog to the beach, although that distance was the farthest he would walk. He used a walking stick to walk. The ALJ questioned him about walking his dog while he used the walking stick, and he said he was able to hold the leash, restrain the dog, and use the stick at the same time. He was able to take care of basic grooming tasks, but he said he would frequently forget whether he had eaten. When asked if he could write himself notes and then follow his own notes, he responded, "No. I'm not very good at that, actually. I don't know if I was ever very good at that." Moreover, he had a hard time staying awake through an eight-hour day. He also told the ALJ that he tires halfway through emptying the dishwasher. When questioned about the dishwasher and asked to put a timeframe on how long he could do something without needing a break, he stated he could perform an activity for 15–20 minutes.

11

Ronnie C. Mayne, a vocational expert, testified by phone.  The ALJ and Raymond's attorney asked about a series of hypothetical individuals with symptoms similar to those English provided in his questionnaire.  Mayne testified that some of the hypothetical individuals could perform the jobs of ticket taker, mail routing clerk, and office clerk helper.  If, however, an individual needed to take breaks for 1.5 hours per day, could not use his upper extremities for more than an hour, or would be absent two or more days per month, that would preclude all employment.

## B.  Course of Proceedings

### 1.  Decision of the ALJ

The ALJ set forth the facts above in even greater detail.  After considering the evidence, she concluded Raymond "has not been under a disability within the meaning of the Social Security Act from October 31, 2009, through [November 18, 2015,] the date of this decision."  The ALJ found the evidence supported the conclusion that Raymond has the following "severe impairments":[4] MS, cognitive disorder, bipolar disorder, depressive disorder, and anxiety.  Nevertheless, the ALJ concluded Raymond "does not have an impairment or combination of impairments

---

[4] A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).

12

that meets or medically equals the severity" of one of the required listed impairments.

More importantly, the ALJ concluded Raymond has "the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)."  That regulation defines light work as

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work,[5] unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

The ALJ found Raymond would be able to perform a job that requires "lifting, carrying, pushing, and pulling 20 pounds occasionally and ten pounds frequently" and "walking for six hours."  The job would allow for a sit/stand option; could require occasional climbing of ramps and stairs but not of ladders and scaffolds; could require "occasional crouching" and "frequent exposure to unprotected

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

heights and moving mechanical parts"; could require "frequent operation of a motor vehicle"; and could require "performing simple, routine tasks."

In so finding, the ALJ first examined the records with respect to Raymond's physical condition. She found Raymond's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible." The ALJ noted Raymond's MS appeared to be stable, as his MRIs did not show any progression of the disease. His physical evaluations, including repetitive muscle testing by Dr. Kats-Kagan, revealed no significant fatigue. Dr. English's office notes did not support his statement in the questionnaire that Raymond experienced significant reproducible fatigue of motor function. Moreover, "[p]hysical examinations consistently indicate[d] that [Raymond] does not appear in acute distress." Although Raymond averred that he had largely lost the use of his left arm, he also testified that he could walk with his walking stick in one hand while using the other hand to restrain his dog. The medical records show Raymond "has good use of his arms and legs and moves about in a satisfactory manner," and there was no evidence any doctor prescribed any device to assist Raymond in walking.[6]

---

[6] In the questionnaire, English answered yes to the following question: "While engaging in occasional standing/walking, must your patient use a cane or other assistive device?" Next to the question, he wrote, "@ times." Nevertheless, the ALJ was correct that nothing in the record indicates any doctor, including Dr. English, formally prescribed any assistive device.

14

With respect to Raymond's mental impairment, the ALJ noted that although Raymond has experienced "a change in intellectual ability, his I.Q. is at the low range of normal."  She also noted that Raymond told Dr. Lee that his medication was helping with his mood difficulties, and he had not sought mental-health treatment.  He is able, the ALJ concluded, to perform simple and repetitive tasks; any contrary conclusion was not "supported by credible evidence."

Regarding Dr. English, the ALJ wrote:

Dr. English is an acceptable medical source who has had a treating relationship with [Raymond] since 2011.  However, Dr. English did not provide a narrative statement or particular medical signs and/or tests to support his opinion.  Further, his opinion is inconsistent with the record as a whole.  I afford Dr. English's opinion limited evidentiary weight.
. . .
Dr. English stated that [Raymond's] pain, fatigue, or other symptoms were at a level severe enough to "constantly" interfere with his attention and concentration.  Dr English assessed [Raymond] as having "marked limitation" in his ability to deal with work stress [].  Such opinion is clearly an overestimate of [Raymond's] functional limitations.  Significant deficits in [Raymond's] ability to maintain attention and concentration have not been detected in a clinical setting.  There are no ongoing signs of unusual anxiety or evidence of depression in a clinical setting.  The objective evidence fails to document an impairment which would be expected to result in severe or disabling pain.

The ALJ also found "vague and speculatory" Dr. Shindell's opinion on Raymond's inability to work, which appeared to be based on Raymond's "self-reports rather than objective clinical findings."  In contrast, the ALJ found that the state agency's consultant, who found Raymond had no severe impairment, had *underestimated*

Raymond's functional limits.  The ALJ afforded only Dr. Lee's assessment great weight because Dr. Lee had the opportunity to examine Raymond and corroborated his clinical findings regarding Raymond's ability to understand and carry out basic instructions, despite a slight limitation in concentrating for extend time.

Having concluded Raymond possessed the residual functional capacity to perform light work, the ALJ then relied on the vocational expert testimony to conclude Raymond was able to perform a significant number of jobs in the national economy.  These included ticket clerks, mail sorters, and office clerk assistants.  Accordingly, the ALJ found Raymond was "not disabled" for the period of October 31, 2009, through the date of the ALJ's decision.

## 2.  Proceedings in the District Court

After the Appeals Council denied Raymond's request for review, Raymond filed this lawsuit in the United States District Court for the Northern District of Florida.  The magistrate judge recommended the district court affirm the ALJ.  The district court adopted the report and recommendation in full.  This timely appeal followed.

## II.  LEGAL STANDARDS

### A.  Standard of Review

16

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).[7] "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Under the substantial-evidence standard of review, we "may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)) (alteration in original). "Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## B.  Determination of Disability

An individual is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

---

[7] The ALJ makes findings on behalf of the Commissioner. *Cf.* 20 C.F.R. § 404.966.

The Commissioner's regulations prescribe a five-step sequential process to determine whether a claimant is disabled under the statute. The ALJ considers, in order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" impairment or combination of impairments; (3) whether the impairment(s) meets or equals one of the listings in the regulation's appendix; (4) whether the claimant possesses the residual functional capacity to perform any past relevant work; and (5) whether the claimant possesses the residual functional capacity and age, education, and work experience to perform other work. 20 C.F.R. § 404.1520(a)(4)(i)–(v). If the ALJ finds the claimant is disabled or not disabled at any step, that is the end of the inquiry. *Id.* § 404.1520(a)(4). "The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments." *Lewis*, 125 F.3d at 1440; *see also* 20 C.F.R. § 404.1545(a).

### III.  OPINION OF DR. ENGLISH

Raymond first argues the ALJ did not afford sufficient weight to Dr. English's opinion in the Multiple Sclerosis Residual Functional Capacity

Questionnaire, in which Dr. English opined that Raymond had numerous severe physical and mental impairments.[8]

The "ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179.  An ALJ considers many factors when weighing a medical opinion, including whether the source of the opinion has examined the claimant; whether the source has treated the claimant, and the length, frequency, nature, and extent of that treatment; whether the opinion is well supported; whether the opinion is consistent with the record; and whether the source is a specialist.  20 C.F.R. § 404.1527(c).  The ALJ must give a treating physician's medical opinion substantial or considerable weight, unless the ALJ clearly articulates good cause for discrediting that opinion.  *See Winschel*, 631 F.3d at 1179.  "Good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* (quoting *Phillips*, 357 F.3d at 1241). The ALJ need not "specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" that suggests the ALJ did

---

[8] Actually, Raymond first argues the ALJ was "new to the role."  We disregard this ad hominem attack.

not consider the record as a whole.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Substantial evidence supports the ALJ's decision not to assign substantial weight to Dr. English's opinions in the questionnaire.  The ALJ found Dr. English's opinions were conclusory, as they were unsupported by narrative statements or particular medical signs and/or tests.  Although Dr. English stated Raymond had significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, he did not support that opinion with clinical testing.  No other physician—treating or consultative—supported that finding.  Dr. English's questionnaire opinions thus went beyond anything in the record, including Dr. English's own prior notes.

Raymond makes much of the fact that Dr. English is a qualified specialist who treated Raymond for several years.  Unfortunately, these things do not overcome the fact that Dr. English's opinion in questionnaire was a large leap from the rest of the record evidence.

Although Raymond asserts the ALJ did not consider Dr. English's treatment notes, that assertion is simply incorrect.[9]  The ALJ found those notes, even though

---

[9] Raymond also complains the ALJ discussed only three of the MRIs.  We reiterate that the ALJ does not need to discuss every piece of evidence in the record.  *See Dyer*, 395 F.3d at 1211.  Further, nothing indicates the ALJ disregarded any MRI.  The ALJ, as Raymond admits, examined the MRI reports and concluded the MS appeared to be stable.  To the ALJ, that stability over time undermined the notion that Raymond's impairments dramatically worsened.

20

they described Raymond's symptoms, did not accord with the statements in the questionnaire.  Dr. English's own physical examinations frequently revealed Raymond had normal grip strength and muscle strength of 5/5 or 4/5.  Moreover, although Raymond attempts to recast the records of the other professionals who examined him to suggest they support Dr. English's opinion, he does so by citing only to favorable portions of those records.  A plethora of physical examinations by Dr. Hudec and a comprehensive examination by Dr. Kats-Kagan[10] were almost entirely unremarkable.

To the extent Raymond points us to specific examples in the record that he believes bolster his position, our standard of review forecloses that strategy.  As the magistrate judge correctly explained, Raymond's "citations to various portions

---

[10] In his reply brief, Raymond describes Dr. Kats-Kagan's physical examination as "pseudo" testing.  Nothing in the record supports Raymond's description.  Dr. Kats-Kagan's notes show a thorough and independent physical evaluation.  Although she may not have examined Raymond's previous MRIs, Raymond does not explain why she would have needed those records in order to evaluate his physical condition.  Raymond also, for the first time in his reply, suggests Dr. Kats-Kagan is not the one who performed the exam.  He points out that a physician's assistant signed the verification-of-payment form, while Dr. Kats-Kagan signed a statement affirming, "I certify that I oversaw and reviewed all components associated with this consultative exam."  He argues a physician's assistant is not an "acceptable medical source" under the relevant regulations.  We are not positioned to resolve this factual ambiguity.  And as "we repeatedly have admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'"  *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (quoting *United States v. Coy*, 19 F.3d 629, 632 n.7 11th Cir. 1994)) (alteration in original).  Finally, Raymond contends the ALJ's failure to assign specific weight to Dr. Kats-Kagan's opinion is, by itself, reversible error.  Even assuming the ALJ erred, we conclude any error was harmless.  Dr. Kats-Kagan's findings do not contradict Dr. Hudec's findings, on which Raymond himself purports to rely, or Dr. Lee's findings, to which the ALJ expressly assigned great weight.

of the record that he believes could support a different interpretation of the record is not sufficient because the nature of this review does not involve reweighing the evidence or substituting the judgment of the Court for that of the Commissioner." Indeed, "[e]ven if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." *Martin*, 894 F.2d at 1529. We conclude the ALJ's findings were supported by substantial evidence.

## IV. RESIDUAL FUNCTIONAL CAPACITY

### A. Ability to Perform Light Work

Raymond next argues that substantial evidence does not support the ALJ's determination that he possesses the residual functional capacity to perform light work, as defined in the regulation and the ALJ's order.

"The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments." *Lewis*, 125 F.3d at 1440. The ALJ makes this assessment by considering the claimant's physical, mental, and other abilities affected by the impairments. 20 C.F.R. § 404.1545(b)–(d).

Raymond's argument regarding the ALJ's residual functional capacity determination is the functional equivalent of his first argument. In essence, he contends the ALJ did not properly weigh the evidence. As he puts it, the residual

functional capacity "finding is directly related to the ALJ's flawed weighing of the evidence and failure to credit the opinions of the treating medical providers . . . as explained in detail in Argument I." In that light, given our discussion of why Raymond's first argument fails, his second argument must also fail.

We note specifically that substantial evidence supports the ALJ's residual functional capacity assessment. In *Moore v. Barnhart*, 405 F.3d 1208 (11th Cir. 2005), we held an ALJ's residual functional capacity determination was supported by substantial evidence where the medical evidence showed moderate deficiencies in concentration and attention but did not require hospitalization; the claimant's condition remained relatively stable, with no diminution in muscle strength, range of motion, or muscle tone; and there were inconsistencies in claimant's testimony as to daily activities and claims of impairment. *Id.* at 1212–13. This case is like *Moore*. First, the ALJ here noted that Raymond had a history of mental impairment, as corroborated by notes from Dr. Shindell and Dr. Lee. But there was no evidence of worsening of neurocognitive testing between Dr. Shindell's examinations (which Dr. English expressly noted); Raymond reported to Dr. Lee that his medication was helping his mood difficulties; and Raymond had never been hospitalized for psychiatric reasons. Second, the ALJ noted that Raymond's condition, as shown in his MRIs and in the various physical examinations he had with Dr. Hudec, Dr. English, and Dr. Kats-Kagan, remained relatively stable.

23

Finally, the ALJ stated, "After careful consideration of the evidence I find that [Raymond's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Raymond's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." The ALJ then noted inconsistencies in Raymond's testimony, which we discuss below.

In light of the foregoing, the ALJ concluded Raymond possessed the residual functional capacity to perform light work. She further concluded, after considering Raymond's mental and cognitive impairments, that the work should be simple and repetitive. Substantial evidence, under our deferential standard of review, supports the ALJ's conclusion.

### B. Jobs in the National Economy

Raymond also contends the ALJ erred in applying the testimony of Mayne, the vocational expert, to determine there was a significant number of jobs that Raymond could perform.

At the fifth step of the disability analysis, the Commissioner bears the burden of showing that, in light of the claimant's residual functional capacity and other factors, "there is other work available in significant numbers in the national economy that the claimant is able to perform." *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded on other grounds by regulation as recognized in*

24

*Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360–61 (11th Cir. 2018).  An

ALJ may make this determination by posing hypothetical questions to a vocational

expert.  *See Winschel*, 631 F.3d at 1180.  "In order for a [vocational expert's]

testimony to constitute substantial evidence, the ALJ must pose a hypothetical

question which comprises all of the claimant's impairments."  *Jones*, 190 F.3d at

1229.  However, an ALJ is "not required to include findings in the hypothetical

that the ALJ had properly rejected as unsupported."  *Crawford v. Comm'r of Soc.

Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

The ALJ posed a hypothetical to Mayne and, based on that hypothetical,

concluded there was a significant number of jobs in the national economy that

Raymond could perform.  Raymond now argues the ALJ did not pose the right

hypothetical—one that accounts for limitations he says he has.  But the

hypothetical on which the ALJ relied encompassed all the limitations she

concluded Raymond faces.  We have explained that substantial evidence supported

that conclusion.  Thus, the ALJ did not err in relying on the hypothetical she posed.

*See Crawford*, 363 F.3d at 1161.

## V.  CREDIBILITY DETERMINATION

Raymond's final argument is that the ALJ erred in making an adverse

credibility determination regarding his testimony.

25

A claimant may seek to establish that he has a disability through his own testimony regarding pain or other subjective symptoms. *Dyer*, 395 F.3d at 1210. "In order to establish a disability based on testimony of pain and other symptoms," a claimant must show "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also* 20 C.F.R. § 404.1529. This "standard also applies to complaints of subjective conditions other than pain." *Holt*, 921 F.2d at 1223. "After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). The ALJ must provide specific reasons for discrediting the claimant's complaints. *Id.* But at bottom "credibility determinations are the province of the ALJ, and we will not disturb a clearly articulated credibility finding supported by substantial evidence." *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014) (citation omitted).

The ALJ clearly articulated a credibility finding that was, as we have said, supported by substantial evidence. The ALJ's findings were specific and detailed. She expressly stated that she considered Raymond's complains of pain and fatigue but found them "not entirely credible." To the ALJ, Raymond's testimony did not

26

comport with the objective medical evidence, nor could the state of his medical conditions reasonably be expected to give rise to his claimed impairments. *Cf. Wilson*, 284 F.3d at 1225–26. Although Raymond's "medically determinable severe impairment of MS could reasonably be expected to produce some symptoms and limitations," those symptoms and limitations would not present "to the extent alleged."[11] Raymond's MRIs were stable. "Physical examinations consistently indicate[d] that [Raymond] does not appear in acute distress." Raymond was able to walk his dog and hold his walking stick (which no evidence showed had been medically prescribed) at the same time;[12] drive eight miles to pick his son up from school each day; and operate a foot-pedal kayak. Moreover, Dr. Shindell also identified concerns about inconsistent responses and over-reporting.

In sum, the ALJ properly considered Raymond's testimony and the relevant evidence to arrive at her adverse credibility determination.

* * *

---

[11] Raymond frequently uses his own testimony to support the argument that his testimony was reliable. Such *ipse dixit* is unpersuasive. The question is whether Raymond's testimony was consistent internally and with the objective evidence.

[12] Raymond takes issue with the ALJ's describing his testimony as follows: Raymond "testified that he could not use his left arm." It is true the ALJ overstated this testimony—but barely. Raymond testified, "I have extremely limited use of my left arm." Raymond's brief suggests that statement is not in tension with Raymond's admission that he restrains his dog with one hand while balancing on a walking stick in the other. We find that suggestion is not serious.

27

Again, we note that throughout his briefing, Raymond cites portions of the record favorable to his argument. But our standard of review does not allow us to reweigh evidence in the manner Raymond would like. Our inquiry is whether the ALJ pointed to sufficient relevant evidence such that a reasonable person would accept the ALJ adequately supported her conclusion. *See Lewis*, 125 F.3d at 1440. Here, even if a reasonable person might find Raymond has marshaled enough evidence to support his position, a reasonable person—maybe even the same reasonable person—could still find the ALJ adequately supported her conclusion. We therefore agree with the district court that the ALJ did not commit reversible error.

**AFFIRMED.**